McArtee *v.* Engart.

---

SMITH McARTEE, Plaintiff in Error, *v.* WILLIAM D. ENGART, Defendant in Error.

ERROR TO SANGAMON.

Inadequacy of consideration in the conveyance of land as between vendor and vendee, would not justify the interposition of a court of equity to set aside the sale, unless the inequality was so gross and palpable as to shock the conscience and convince the judgment; but where fraudulent practices are used, under such peculiar circumstances as make the vendor a prey of the vendee, the aid of the court may be obtained.

Amendments will be allowed in proceedings in chancery, at the discretion of the court.

In proceedings in chancery, costs are in the discretion of the court, except in a few specified cases, as directed by statute law.

THE facts of this case are fully set out in the opinion of the Court. The decree was rendered by DAVIS, Judge, in the Sangamon Circuit Court.

S. T. LOGAN, and STUART & EDWARDS, for plaintiff in error.

A. LINCOLN, W. J. FERGUSON, and W. H. HERNDON, for defendant in error.

TREAT, C. J. In August, 1849, Engart brought a suit in chancery against McArtee. The bill alleged that the complainant, being the owner of ninety acres of land, conveyed the same to the defendant, on the 22d of November, 1847, for the expressed consideration of $350, but really for $200 in money, and a horse, saddle, and bridle, not worth $100, and that the land was then in fact worth $1,000; that for a long time previous to the conveyance, the complainant had been in the habit of the immoderate use of spirituous liquors, and, when intoxicated, was wholly incapable of the rational management of his affairs; that the defendant was well acquainted with the complainant and his habits of intoxication, and the effect thereof upon his mind; that when the deed was executed, the complainant was so much intoxicated as to be incapable of rational action; that the defendant made use of cunning and artifice to get the complainant intoxicated, and then, taking advantage of his condition, fraudulently induced him to execute the deed; that the complainant afterwards called on the defendant for the purpose of restoring the consideration, and demanding a re-conveyance of the land, but was informed by him that the contract would not be rescinded; the complainant offered in the bill to refund the consideration and interest, and prayed for a re-conveyance of the land, and waived the oath of the defendant to his answer.

The defendant by his answer admitted the conveyance of the land, and alleged that the horse, saddle, and bridle, were worth $150; denied that the land was worth $1,000, and insisted that $350 was the highest price that could have been obtained for it

at the time; denied that the complainant was intoxicated when the trade was made, and that he was incapable of rationally managing his business; denied that he used any cunning, artifice, or fraud to procure the conveyance, but alleged that the complainant was induced to sell the land for the best price he could obtain, and quit the country, to avoid an indictment for larceny then pending against him; denied that the complainant ever demanded a re-conveyance of the land, and offered to refund the purchase-money, but insisted that all differences between the parties relative to the land had been submitted to arbitration, and decided wholly in favor of the defendant. The complainant filed a general replication.

At the September term, 1849, by agreement of the parties, the cause was set for hearing at the next term. At the March term, 1850, the complainant obtained leave to withdraw his replication, and amend the bill. The bill was so amended as to set up the statute of frauds to the submission and award relied on in the answer. At the March term, 1851, the complainant introduced the following testimony. Bateman testified, that he was brother-in-law of complainant; at November term, 1849, complainant was indicted for stealing a pair of shoes, and the sheriff requested witness to become his bail; on his way to the court-house, on Saturday, witness met defendant, and asked him to go bail, but he refused; witness became security in a recognizance for fifty dollars, and complainant went into the country; on Sunday morning, the defendant, who resided twelve miles from town, came to the house of witness, in Springfield, and remarked that he had come to bail complainant out of jail, and had a trade laid up for him, and would give him for the land $200 in cash, a horse and rigging, release him from the bail-bond, and let him go; defendant came back early on Monday morning and inquired for complainant, who had not returned; he returned at noon, and defendant was at the shop of witness waiting for him; defendant then made the offer before mentioned for the land, which complainant refused to accept; defendant insisted that he should take it, and advised him it was the best thing he could do; they talked about the matter for some time, and witness concluded there would be no trade; defendant then pro-

posed to go and treat the company, but no one went with him except the complainant; they returned in half an hour, the complainant much under the influence of liquor; they again talked about the trade, and complainant was still opposed to it; defendant insisted on the trade, and told complainant there would be two or three indictments against him, and he had better clear out; complainant finally agreed to accept the proposition, shed tears freely, and said he was ruined; they then went away together, and were absent all the afternoon; about dark, witness went with them to the court-house, where the deed was executed; they then went to Bunn's store, and defendant paid complainant $200 in cash, and liquor was called for and drank; complainant was about twenty-two years of age, and very little liquor made a fool of him; he was raised where the defendant resided, and the latter had known him from a boy, and insisted, while urging the trade, that he was his friend; complainant did not seem to be alarmed until he was intoxicated, and then the longer they talked about the matter, the more he became frightened; when the trade was made, the complainant was not capable of acting for himself, but did not appear to be intoxicated at the time the deed was executed; he was sober the next morning, when he received the horse and rigging, and went away; the land was worth $900. Lasswell testified, that he had known complainant for many years, and had frequently seen him in liquor, and on such occasions he had very little sense; the land was worth $900, at the time of the trade; horse and rigging not worth more than $70. Allsbury testified, that complainant was very groggy when the trade was made; saw the parties drinking together twice during the afternoon. Dragoo testified, that the land was worth seven or eight dollars per acre; witness was at defendant's house shortly after the trade, and complainant told defendant he wanted to get the land back or spend more upon it, and defendant answered that he did not make child's bargains; complainant then said he would give him back his money and property, and $50, and defendant said he would arbitrate the matter with him there or in Springfield; complainant talked about going to Springfield to have it settled, but defendant said if he did he must pay him for his trouble; they finally agreed to arbitrate

21 *

McArtee *v.* Engart.

the matter before the witness and two other persons; they both made statements, from which it appeared that the defendant was to give $200, horse and rigging, and release the bail-bond, for the land; during the arbitration defendant told complainant that he had better take his property and clear himself, for it was rumored about town that he would be taken up for stealing horses; arbitrators decided against complainant; some liquor was drank on the occasion, but complainant did not appear to be intoxicated. Sanders testified, that the land was worth between six and seven dollars per acre. Lovelock testified, that the land was worth six or seven hundred dollars. Sumpter testified, that it was worth from five to six dollars per acre. Lovelock testified, that he was at the defendant's house a short time after the trade, and defendant said he was good for nothing but trading and drinking whiskey, and that the complainant had gone, and the devil knew where; at that moment complainant came to the house, and said that he would rather die than leave his people; defendant gave him some whiskey, and told him he would get to see the country by going away. Field testified, that the defendant came to his house a few days after the trade, and said the complainant had put him out; the sister of witness observed that he might come back for all me, and defendant replied, while he had him in the right fix he made it all in black and white.

It was admitted that complainant appeared at a subsequent term of the court, pleaded guilty to the indictment, and was fined $10. It was also admitted, that the defendant had been in possession of the land since the trade. The complainant deposited $300 in court.

The defendant introduced the following testimony. Bays testified, that the land was worth five dollars per acre. Kent testified, that he saw the complainant at ten o'clock of the morning of the day of trade, and he inquired for defendant; spoke about stealing shoes, and wanted to borrow money; Moffett testified, that he wrote the deed, and took the acknowledgment of the complainant; he did not appear to be intoxicated. Penn testified, that the land was worth five dollars per acre, and he offered complainant that price a few months before the trade.

McArtee *v.* Engart.

Bunn testified, that he counted the $200 to the complainant, and saw no signs of intoxication. Hill testified, that he was one of the arbitrators, and understood the only question for them to decide was whether defendant should pay any thing more for the land; the parties agreed that the price was $200 in cash, and the horse and rigging, and nothing was said about the value of the land; witness asked complainant if he made the trade in good faith, and if the price had been paid, and he answered both questions in the affirmative; neither the submission nor the award were in writing.

Afterwards, and during the same term, the complainant obtained leave to withdraw the replication and amend his bill. The bill was so amended as to charge, that, at the time of the execution of the deed, complainant was in great distress of mind because of the indictment pending against him; that defendant was well aware of that fact, and of his habits of intoxication, and of the effect upon his mind; that complainant was in such condition of mind caused by distress and intoxication, as to be wholly incapable of rational action; that defendant used cunning and artifice to excite his shame and fear to the highest pitch, and in connection therewith to procure him to become intoxicated, and then taking advantage of his situation, fraudulently induced him to execute the deed for an inadequate consideration. The defendant answered these allegations by a general denial, and the complainant refiled the replication. The parties then submitted the cause to the court upon the evidence already introduced.

At the August term, 1851, a decree was entered vacating and annulling the deed in question, and requiring the defendant to re-convey the land to the complainant; that the defendant pay the costs of the proceeding, except $30 ordered to be paid by the complainant in consequence of the last amendment of the bill; that the real consideration advanced by the defendant was $270, and that the rents and profits of the land were equal to the interest on that sum; that the clerk take $30 of the amount deposited in court and pay complainant's share of the costs; that out of the same fund he pay the defendant's costs, and then pay the balance to the defendant. From that decree, the defendant prosecuted a writ of error.

The difference between the value of the land and the price for which it was sold, would not, of itself, justify the interposition of a court of equity. Except as to creditors, a man may consult his own wishes in the disposition of his property. He may dispose of it on such terms, and for such prices, as he pleases. If he meets a purchaser on equal ground, and parts with his estate for less than it is worth, he has no claim to relief in equity. He must abide the consequences of an injudicious bargain, if voluntarily and fairly made. It is not the province of a court to inquire, whether the contract will operate to his advantage or prejudice. It will not interfere with the sale, unless there has been 'some fraud, mistake, or undue influence. As a general principle, inadequacy of price is not a sufficient ground for setting aside a conveyance of property. A court of equity, in the exercise of a sound discretion, may refuse to decree the specific performance of an agreement founded on an insufficient consideration ; but it will not rescind an executed contract merely because the consideration was inadequate. Osgood *v.* Franklin, 2 Johns. C. R. 1 ; Low *v.* Barchard, 8 Ves. 133 ; Wood *v.* Abrey, 3 Mad. Rep. 417 ; Naylor *v.* Winch, 1 Simons & Stuart, 555. There may be cases where the court will interfere on the ground that the price is so inadequate as to afford decisive evidence of fraud or undue influence. But to produce such a result, the inequality must be so gross and palpable as to shock the conscience, and convince the judgment that there has been imposition or oppression. 1 Story's Eq. s. 246 ; Underhill *v.* Horwood, 10 Ves. 209 ; Copis *v.* Middleton, 2 Mad. Rep. 556 ; Stillwell *v.* Williams, 1 Jac. 280. The inequality in the present case is not of such a character. It does not necessarily indicate the least fraud or unfairness. It might be entirely consistent with honest dealing. Although the land was sold for much less than its real value, we should not hesitate to deny the relief sought, if there were no other circumstances calculated to impeach the fairness of the transaction.

But there are circumstances in the case which tend strongly to the conclusion, that the conveyance was obtained through improper influences, and ought therefore to be set aside ; and in this connection the inadequacy of price may properly be taken into consideration. It is manifest, from the evidence, that the complainant was an

ignorant and weak-minded man at best, and incapable of the rational management of his affairs when under the influence of spirituous liquor. In a state of intoxication, he was easily imposed on, especially by those in whom he reposed confidence. The defendant was a shrewd and unscrupulous man ; possessed of a thorough knowledge of the complainant's character, and in a position to exercise considerable influence over him. In this state of things, the complainant was indicted for larceny, and gave bail for his appearance. He manifested no disposition to avoid an investigation of the charge, until his fears were excited by the representations of the defendant. The latter refused to become security in the recognizance, until he supposed the complainant was safely lodged in jail. He then assumed the guise of a friend, and expressed much anxiety to procure his release from custody. But his plan was, that the complainant should convey him the land for an inadequate consideration, forfeit the recognizance, and leave the country. To effect this last object, and relieve Bateman from· responsibility as surety, he offered to provide the complainant with the means of escape, and discharge any judgment that might be entered on the recognizance. The proposition was promptly rejected by the complainant. The defendant repeated the offer again and again, and as often urged the complainant to accept it. Failing to accomplish his purpose in this way, he managed to get the complainant intoxicated, and again renewed the offer, and insisted upon its acceptance. The complainant still manifesting an unwillingness to sell the land and go away, the defendant then assured him that there would be other indictments presented against him, and advised him to accept the offer, and abandon the country. Finally, under the combined influence of intoxication and fear caused by the defendant, the complainant acceded to the proposition, and the arrangement was consummated. It is very evident, that but for these expedients, the purchase could not have been effected. Beyond all doubt, the representations and advice of the defendant had a controlling influence upon the action of the complainant. Barely competent at any time to transact business discreetly, and peculiarly disqualified on that occasion by intoxication and terror, he was completely in the power of the

defendant. The parties did not deal with each other on equal terms. The one through fraudulent practices became the prey of the other. The inequality of condition was produced by the defendant, and then taken advantage of by him to procure a conveyance of the land, which, under ordinary circumstances, there is every reason to believe he could not have obtained. The fact that the deed was not executed and the consideration paid until the complainant appeared to be sober, does not affect the real merits of the case. If he was not still under the influence of liquor, he was evidently laboring under the apprehensions excited by the defendant, and impressed with the belief that he had better part with the land, and depart from the country. There was nothing in the subsequent conduct of the parties, calculated to weaken this view of the case. The interviews between them disclosed the ignorance and imbecility of the complainant, and the superiority and fraud of the defendant. The complainant was on every occasion furnished with liquor, and then advised to absent himself from the country, or threatened with criminal prosecutions if he remained. The arbitration was little else than a farce. The submission and award resting entirely in parol, were of course obnoxious to the statute of frauds.

There is one feature of the case which demands especial notice. The defendant succeeded in obtaining the conveyance, by inducing the complainant to disregard his obligation to appear and answer to the indictment. It was a clear violation of duty on his part, to aid or encourage the complainant to avoid an investigation of the charge against him. There may be some color of excuse for such a cause, when prompted by feelings of affection or friendship for the accused. But a man who will, from sordid considerations, deliberately assist or advise another to evade the demands of public justice, deserves no favor at the hands of a court of equity. It should not lend its aid to enable him to retain any advantage acquired under such circumstances. It is the duty of every citizen to aid in the execution of the laws, and in no contingency is he at liberty to encourage their violation, or assist offenders to escape detection and punishment.

There was no error in allowing the amendments to the bill. On the coming in of the answer, the complainant had a clear

right to amend the bill, by setting up the statute of frauds against the new matter introduced into the case by the answer. The application to amend was addressed to the sound discretion of the court, which it was at liberty to allow or refuse. We are not prepared to hold that the discretion was improperly exercised. See Jefferson County *v.* Ferguson, *ante* 33. In proceedings in chancery, under our statute, costs are in the discretion of the court, except in a few specified cases, of which the present was not one. Rev. St. ch. 26, sec. 15. Nor was there any error in directing the costs to be paid out of the fund in court. The fund was under the control of the court, and liable to be applied to the payment of the costs, adjudged against the defendant. It would be a useless ceremony to pay the money to the defendant, and then issue an execution against him for the amount of the costs. He has no reason to complain, for the money was applied to his use.

The decree is affirmed.                *Decree affirmed.*