## Case No. 7,265.

### JENKINS v. EINSTEIN et al.

[3 Biss. 128.][1]

Circuit Court, N. D. Illinois. July Term, 1871.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

George F. Harding and Milton T. Peters, for complainant.

Rich & Thomas, for defendant Rich.

Rosenthal & Pence, for defendant Einstein.

BLODGETT, District Judge. The whole case centers around this transaction, the complainant alleging that it was fraudulent: 1st. Because it was made with intent to hinder, delay and defraud the creditors of Pollard. 2d. Because Pollard was imposed upon as to the amount of indebtedness held by Rich against him and against the firm of R. M. Whipple & Co. 3d. Because Rich occupied a confidential relation to Pollard as his attorney, and took advantage of that relation to impose upon him. 4th. That if the conveyances are valid for any purpose, they are in the nature of security for the actual indebtedness existing, and should only be held valid to that extent; that an account should be stated between Pollard and Rich, and redemption allowed upon payment of the amount found due, it being assumed that the evidence establishes the fact that there was an express contemporaneous agreement between them, that any advance in the value of the property should enure to the benefit of Mr. Pollard.

1. Were these deeds made with intent to hinder, delay or defraud the creditors of Mr. Pollard? This transaction was on the 16th day of November, 1866. As the law then stood, debtors in failing circumstances were allowed to prefer their creditors, and our courts sustained such preferences where there was no fraudulent act as between the parties, enabling the creditor preferred to absorb an undue share of the property. It will be seen from the evidence in the case, that there was some bona fide indebtedness which Pollard was both legally and morally bound to pay. The evidence of Rodney M. Whipple has been taken in this case with a view to reduce the aggregate amount of this indebtedness. This witness had been guilty of the grossest breach of trust towards Rich, in the abstraction of a part of his collateral securities for this indebtedness. He had, on one occasion, visited Rich, and assured him that a certain collateral note held by him, would be paid that day if presented, and that he would collect and return the money. Rich entrusted him with the note. He obtained the money and converted it to his own use, thereby rendering himself a proper subject for criminal prosecution. But on the faith of Pollard's pledge that no harm should ultimately result from this transaction, Rich did not prosecute.

Pollard's evidence is also taken, and he attempts to explain and show that by various transactions, from time to time, he had succeeded in reducing this indebtedness. But Rich held the notes referred to; he had Pollard's personal pledge that he would see them paid; he had made the transaction with Whipple & Co. on the strength of that pledge; and, taking the testimony of the defendants, in connection with the vouchers presented, it is much more satisfactory and conclusive, and, balancing all the testimony together, I have no doubt the weight and preponderance of proof is, and I am clearly of opinion that such an indebtedness existed, swelled by accrued interest, to nearly or quite the amount claimed by Rich.

It is strenuously urged that some portion of this indebtedness was made up of usurious interest and fictitious amounts which ought not to be allowed. I will not now discuss the question of usurious interest. This is not a bill to set aside the transaction for usury, and I doubt whether the creditors of Pollard could have relief on that ground.

Again: Even if this transaction was made by Mr. Pollard with fraudulent intent, his intentions alone will not control; we must ascertain the intention of both of the parties to the conveyance. The evidence is very conclusive that Mr. Pollard, up to this time, had maintained a high character for commercial integrity. But the affairs of R. M. Whipple & Co. had got into such condition that financial ruin was staring him in the face. He may have thought that if he turned this property over to Rich, and was subsequently able, by the improvement in the affairs of R. M. Whipple & Co., to pay the liabilities of that firm, Rich would be much more ready to give him back the property without profit, or at only fair rates

of interest on the money invested, than a stranger. It is a natural inference, from all the testimony developed in the case, showing "the intimate and friendly relations which then existed between them, that under the circumstances Pollard would have preferred to deal with Rich, rather than a stranger.

The alleged inadequacy of price is another circumstance which is seized upon by the complainant in this case to establish the intent of fraud, and it becomes necessary that I should examine the testimony carefully to see whether the charge of inadequacy is made out. There is no doubt that where a debtor in failing circumstances, or actually insolvent, conveys his property to a creditor, even by a legal preference, for a grossly inadequate price, such conveyance is fraudulent as against other creditors. He has no right to cover up and conceal, or spirit away more property than is necessary to pay the creditor whom he legally prefers; the preference must be fair and just.

With reference to the value of the property, the evidence of several prominent real estate dealers has been taken in the case, and there is no very great discrepancy in their testimony as to the actual value of the Wabash avenue property, aside from the improvements. They rate the ground in November, 1866, from $200 to $300 per front foot. With my experience in regard to the discrepancy between witnesses in estimating the value of property at an anterior date, I am not surprised at these various estimates. The disparity is mainly in regard to the value of the improvements, some of the witnesses claiming that their value was merely what the house was worth to move off; that when the property reached a value of $250 per foot, a single wooden dwelling house upon it would not rent for enough to pay a fair profit on the investment, and that it was necessary to remove the old building and erect one of such character that the rental will return a fair profit on the investment. And this seems to be a business-like view to take of the subject. Of course there may have been a speculation in it; the property may have advanced from causes the parties had no right to anticipate. But when a man with money is asked to buy property in Chicago, and pay in cash, the question he would naturally ask himself is, whether he can obtain a fair income on the money he pays? It is very obvious from the testimony that the rental of this single house, standing on these lots, would not have afforded much income on the investment, at the price per front foot which the witnesses estimate it worth.

I therefore conclude that the evidence in regard to the value of the Wabash avenue property does not justify the court in assuming that it was worth, at that time, in cash, more than $15,000 to $18,000. The court must take notice of the fact that there is a wide difference between buying on small margins, expecting to realize out of the advance in price, and buying for cash. These speculative terms, known as "canal time," or one to five years, make widely different transactions from one where cash in hand is paid. In the latter case the purchase must be at such price as will sustain the investment. Nearly all of complainant's witnesses place the value of the house at about $10,000. It may have cost that; it was a well built house; was built by Mr. Pollard for his own home, and may have had that value to him in that place. But when the property is considered by the capitalist as an investment, it must be looked at from another stand-point. The defendant's witnesses, on the contrary, estimate the house at about what it would be worth to move off; from $1,500 to $5,000.

There is another consideration: The testimony of most of the witnesses was taken within the last year, nearly four years after the time of these transactions. It is conceded that there has been a very large advance in the price of property in the vicinity during that time. Now it is almost impossible for witnesses to recur to prices at that time, and state, with any approach to accuracy, its value at that remote period. Their present opinion will be influenced by the subsequent advance. The supreme court of this state, in the case of Baldwin v. Dunton, 40 Ill. 196, say: "It is not easy for the fairest and most unprejudiced mind, after a length of time, to recall with accuracy former values of property, and this is especially true where there has been a large appreciation in prices. Under such circumstances it is difficult to fix the true value of propery at an anterior date. * * To require a rescission the consideration must be grossly inadequate." This is the rule laid down by all the authorities in regard to the rescission of contracts for inadequacy of consideration. The consideration must be so inadequate as to strike the mind at first blush as far below the actual value of the property, and to cleary indicate the existence of some unfair dealing, some fraud, imposition, or oppression by the purchaser. McArtee v. Engart, 13 Ill. 242. The rule is well stated by Chancellor Kent, in Osgood v. Franklin, 2 Johns. Ch. 23. He says: "There is no case where mere inadequacy of price, independent of other circumstances, has been held sufficient to set aside a sale made between parties standing on equal ground, and dealing with each other without imposition or oppression; and the inequality amounting to fraud, must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense."

It is also urged as a badge of fraud in this case that Rich bought without an examina-

tion of title; without being furnished with an abstract; without any such precautions as purchasers usually require. But the answer to that is, that he had been the attorney of Pollard, and knew, or thought he knew, substantially the title, and was willing to take the property with Pollard's warranty deed, without a very careful examination. The result shows that he was a loser by the transaction, because it turned out that there were prior judgment liens upon the property, which Rich was subsequently compelled to pay, to the amount of over $13,000, in order to protect his title acquired by the deed.

2. Was Pollard imposed upon as to the extent of debts which Rich had against him? Pollard himself does not now attempt to swear that he was. But Whipple swears that a part was paid and the balance was usury. It will be borne in mind that Pollard agreed to give Rich $3,750 bonus for negotiating the loan in June, 1866, and that some of the notes given for this loan were reckoned in the indebtedness which was paid by Pollard at the time of the conveyances, and it is claimed that this bonus should be deducted. But Rich only acted as negotiator in obtaining the loan; both Whipple and Pollard knew that he did not pretend that he was loaning his own money. It is true he was receiving a considerable commission, but they had a right to estimate the value of his services; it is not for the court to say what was the value. The negotiation was for a large sum, and Rich guaranteed a large portion of the debt to the parties from whom the money was obtained, and subsequently had to pay it. I do not think it lies in the mouth of this complainant to question that transaction. It was a debt acknowledged by both Whipple and Pollard, and so far as this court is concerned, is to be held valid. I do not think the charge of imposition in regard to the extent of indebtedness is made out.

3. Did Rich occupy such confidential relations as prohibited his buying Pollard's real estate? The evidence shows that Mr. Rich had been the attorney of Pollard for many years. Pollard says that he had other attorneys, but the weight of evidence is that Rich had acted as his attorney more frequently than any other person. They had also been intimate friends. But there is no evidence that Pollard consulted Rich as his attorney, or that Rich was in any position to take advantage of him. He undoubtedly had the hold on Pollard which one friend has upon another when that other is in straightened circumstances. He would naturally prefer, if he could pay but one debt, to pay that of his friend. Pollard was fully aware of the value of the property, and in all respects capable of acting for himself. Indeed he seems to have been much more sanguine in regard to the future value of the property than Rich or other persons. Nor

does there seem to have been any influence to control his own independent judgment in regard to it. There is no proof in the case that Rich was consulted as the attorney of Pollard in regard to the transaction, or that his advice as a lawyer either suggested or consummated the bargain. The rule laid down by Judge Story is, that when the transaction between client and attorney is totally disconnected with the relation, and concerns objects and things not embraced in or affected by, or dependent upon that relation, they stand upon the rights and duties common to all other persons and may deal with each other. 1 Story, Eq. Jur. § 313. In the case of Montesquieu v. Sandys, 18 Ves. 313, Lord Ch. Eldon says: "There is no authority establishing, nor was it ever laid down, that an attorney cannot purchase from his client what was not in any degree the object of his concern as attorney, the client making the proposal himself, proposing the price, no confidence asked or received in that article, and both ignorant of the value. Under such circumstances he is not the attorney in hac re, and therefore, not being under any duty as attorney to advise against the act, he may be the purchaser."

4. Were the conveyances made by way of security only, for actual indebtedness then existing? Pollard had pledged his honor that Rich should lose nothing by the loan to R. M. Whipple & Co.; he had no money with which to meet the obligation; he felt pressing upon him the duty and necessity of seeing that debt paid, and like an honest man he proposed to give what he had, which was the Fourth avenue property, Rich paying him the difference between its fair value and the amount of the indebtedness he then held. He had negotiated a sale of the Wabash avenue property to Pierce, but afterward learned that possibly Rich might be willing to buy it at the price for which he had proposed to sell, and at once replied that he "would prefer to sell to Rich; he is an honorable man, and is straight in every particular; he has no mean tricks about him." Now, there is no evidence whatever that the sale of this property to Pierce, then contemplated, was to be any other than a bona fide, absolute sale, and for the same price for which it was subsequently sold to Rich. My conclusion is that when Pollard found that Rich was disposed to buy, his mind at once jumped to the conclusion that he would prefer to sell to him, because, if successful in extricating himself from his embarrassments, he could more readily re-purchase from his friend than from a stranger. If sold to Pierce it was irrevocably gone, while if sold to Rich he had the anchor of friendship to his hopes that it might be subsequently returned to him on some fair terms; and he, therefore, without hesitation, dropped at once the negotiation with Pierce for the sake of selling to Rich.

It is urged very strenuously on the part of

the complainant that the paper of R. M. Whipple & Co., which was turned out in part payment for the property, was not then worth over ten cents on the dollar. It does not lie in the mouth of this complainant to make this averment. R. M. Whipple & Co. and Pollard, as a member of the firm, owed Rich, and as long as Pollard had money or means to pay, it did not lie in his mouth to say it was worth any less than its face. Preferences were then allowed and Rich had a right to secure such preference; and, therefore, the argument in regard to the then value of the paper has no weight on my mind.

All the testimony in regard to Pollard's transactions about this time shows this was the theory on which he proceeded; that he was paying Rich a personal obligation, and converting what remained of his property into means with which to pay those of his individual creditors to whom he felt under strong personal obligations. His relations with Rich were such, perhaps, as justified him in expecting the fairest treatment at his hands. But I see nothing in the testimony to show that Rich ever abused his professional or friendly relations with Pollard. I think the evidence shows rather that he made the purchase with reluctance and hesitation; that he would have preferred the money due him from Pollard and Whipple. In the case of Baldwin v. Dunton, before cited, the court says: "We are aware of no rule which prevents a friend, however intimate, from purchasing property of another; one friend or a relative has the unquestioned right to trade with another. And such considerations usually induce the giving a preference to a relative or a friend, rather than to a stranger, where a party is compelled to sell property at a bargain." In this case, undoubtedly, the property was sold at a bargain; undoubtedly Rich expected to make money out of it. But grant the full force of the rule insisted on by complainant, and even then was this transaction such that it shall only be treated as mortgage to Rich for the amount of his present claim against Pollard or against R. M. Whipple & Co.? In Sutphen v. Cushman, 35 Ill. 193, the supreme court of this state lay down the rule that parol evidence of what was said at the time the deed was made, and of any understanding or agreement of the parties independent of the deed, cannot be introduced to show that a conveyance, absolute on its face, was only intended as a mortgage. This rule shuts out from consideration all that Pollard, Waterman and Whipple testify to, in regard to any understanding or agreement of the parties, at the time the deed was made. The relations between the parties may be shown, and the facts and circumstances surrounding the transaction; but loose conversations and statements, which one or both of the parties may have indulged in as to what their intentions were, are not evidence to change the character of the document itself. If the relation of debtor and creditor existed at the time when the deed was executed, and continued thereafter; if the creditor retained the evidence of indebtedness and sought to enforce the original obligation of the debtor—that furnishes conclusive evidence of the character of the transaction as regarded by the parties themselves, and the courts, in such case, say that the deed, though absolute on its face, is to be considered a mortgage.

But in this case the evidence is very satisfactory that the paper forming part of the consideration of the Fourth avenue property, being notes and memorandum checks, as before stated, to the amount of $20,000, including accrued interest, were, upon the execution of the deed, put in an envelope and handed to Pollard; that after keeping them some time in his possession, he went into Rich's office and asked if he would keep them for him, stating that he did not want the boys at the store to know too much about his private business; that Rich refused to take them, and they were then handed over to Waterman, who laid them in the safe, where they remained with the seal unbroken until some months afterwards, when they were taken out by Pollard and have since been in his possession. There has been no claim of the continuance of the relation of debtor and creditor since that time; Rich has not sought to enforce the payment of these debts against Whipple or Pollard. He took immediate possession of the purchased property. The tenants in possession of the houses on Fourth avenue at once attorned to him and continued to pay rent to him until Einstein bought the property. Pollard, within a few days, took a lease of the Wabash avenue property, and though he has not paid much rent, it is very evident that is not because Rich did not demand it. When the taxes became due, even for the current year, the tax collector was sent to Rich, by Pollard, and he paid them, and has continued to pay all taxes and assessments on the premises from that time to the commencement of this suit.

There is a large amount of testimony in the case, consisting mainly of declarations made by Pollard, his statements of what he considered to be the transaction, and verbal promises made to him by Rich, such as that he would give him the advance or rise on the property. The objection to this testimony is simply that these were merely parol promises, which, if made at all, were without consideration and which cannot be enforced either in law or equity. The relation of debtor and creditor had ceased, as before stated, and there seems to be no reason for assuming that these declarations made by Rich, from time to time, during the ensuing year, were anything more than the good-natured promises of one friend to another, which he was under no legal obliga-

tion to carry out. The evidence is that Rich, within a year after this transaction, did offer repeatedly, to deed the property to any one whom Pollard would get to relieve him. My inference from all this is that he was then willing to part with the property for what it had cost him.

It is clear to my mind that it is not the duty of a court of equity to change the terms of an absolute deed, unless the testimony upon which you seek to do it is of so unquestioned a character as to satisfy the court that in doing so, it is not doing injustice rather than justice to the parties. Rich, for all that appears here, was acting with entire fairness. I can see nothing in the evidence which shows any disposition on his part to act unfairly, and nothing since the case commenced that shows any disposition to do more than to protect his rights against the imputations and charges brought against him.

The proof, then, in my estimation, falls far short of establishing either of the propositions on which the complainant claims to recover. I shall, therefore, be compelled to find the issues made in the case for the defendants, and dismiss the bill. This view of the case relieves me from the consideration of the relation which Einstein and Austin bear to the title. Bill dismissed.