VANSICKLE v. WELLS, FARGO & CO.

(Circuit Court, D. Nevada. November 14, 1900.)

No. 599.

1. FRAUDULENT CONVEYANCES—EVIDENCE OF FRAUDULENT INTENT.

The fact that land was assessed in the name of a husband for several years after he had conveyed it to his wife and the deed had been recorded does not tend to show that the conveyance was made for the purpose of defrauding the husband's creditors, where it was not so listed at the instance of either husband or wife, but through the custom of the assessing officers to copy from previous assessment rolls.

2. SAME—DEED FROM HUSBAND TO WIFE.

A deed of property from a husband to his wife in payment of an indebtedness cannot be impeached by another creditor of the husband on the ground that the accounts between the husband and wife had not been so kept that the wife could have legally enforced her claim, or that such claim, or a portion of it, was barred by limitations.

3. SAME—EVIDENCE—FRAUDULENT INTENT.

The fact that a portion of an indebtedness from a husband to his wife, in payment of which he conveyed property to her, was barred by limitations, is admissible in evidence in support of a claim that the conveyance was fraudulent, to be considered on the question of good faith.

4. SAME—HUSBAND AND WIFE.

The failure of a wife to file an inventory of her separate property as required by Cutting's Comp. Ann. Laws Nev. §§ 512–514, does not affect her rights as against a creditor of her husband seeking to impeach the conveyance of such property to her as fraudulent.

5. HUSBAND AND WIFE—CONVEYANCE BETWEEN—NEVADA STATUTES.

Under the statutes of Nevada defining the rights of husband and wife (Cutting's Comp. Ann. Laws Nev. §§ 524, 528), which provide that, when a husband permits his wife to appropriate to her own use her earnings, the same, with the issues and profits thereof, shall be her separate property; and which permit a husband and wife to contract with each other

respecting property as if unmarried, an agreement between a husband and wife that the wife shall have as her own the proceeds of butter,* eggs, and poultry which she raised and sold is valid; and where she from time to time loaned sums therefrom to her husband, or permitted him to use the same, on his agreement to repay, the indebtedness thereby created constituted a valuable consideration for the conveyance of property to her in payment.

6. SAME—PREFERENCE OF WIFE—INTENT.

In the absence of a statutory provision forbidding preferences, a conveyance of property by a husband to his wife in payment of a valid indebtedness is not fraudulent as to his other creditors, although he is insolvent, unless made with a fraudulent intent, and accepted with knowledge of such intent; and the relationship between the parties, while it is entitled to be considered upon the question of intent, is not in itself a badge of fraud.

In Equity.  Suit to enjoin the sale of property on execution.

From the evidence in this suit it appears that the complainant came to Nevada in 1856, when she was 16 years of age, and then became acquainted with P. W. Vansickle; that they were married in 1857; that they both worked as laborers for a brother of P. W. Vansickle; that the property in controversy was then uncultivated government land in the possession of the brother, from whom P. W. Vansickle acquired it, and he and his wife, since the spring of 1858, have lived upon the land, cultivated and improved it.  When they went upon the premises there was a small house, consisting of four rooms,—two bed rooms, a sitting room, and a kitchen,—in which they lived and reared a family of five children.  In addition to the cultivation of the land and raising crops thereon, they acquired cows, horses, and chickens.  Mrs. Vansickle, in addition to her other household duties, made butter; and the butter, chickens, and eggs were sold, among other things, for the support of the family.  Within one year after their marriage there was an agreement made between the husband and the wife that she should have all the money realized from the sale of the butter, chickens, and eggs, as her own.  In pursuance of this agreement she sold the butter, chickens, and eggs on her own account at Virginia City and elsewhere.  There were no accounts kept of these sales for several years,—in fact, not until 1872, when the eldest daughter commenced keeping a memorandum of the sales and receipts from these sources, and of the accounts between her father and mother, and continued keeping such accounts until 1894.  The husband often sold the butter, etc., for his wife.  Sometimes he paid the money received therefor over to her, and at other times only rendered an account thereof, as he had spent the money.  At different times he asked his wife for money, and she gave it to him, for the purpose of paying his debts.  The proofs offered with reference to these transactions show an indebtedness from the husband to the wife equal to, if not exceeding, the value of the property at the time it was deeded to her by her husband.  With reference to the execution of the deed in 1886 the testimony shows that the wife had at various times stated to her husband that he was largely indebted to her, and that he ought to give her a deed of the property, so that she could take care of herself and family.  About the time of the execution of the deed he was taken sick, and the family thought he was seriously ill.  On this account she repeated her previous requests, and again urged him to make the deed.  The deed was executed and recorded without her knowledge, but he within two months thereafter told her of its execution, and then delivered the deed to her.  Prior to the execution and delivery of the deed her husband managed and controlled the property, and directed the work done thereon.  Thereafter he had nothing to do with it.  The wife and eldest son performed those duties.  The husband, however, lived with the family on the premises, received his board, and, after he quit the butchering business, conducted and carried on the purchase and sale of chickens and eggs on his own account.  The husband was engaged as a butcher and conducted a butcher shop at Genoa for several years before the deed was executed, and thereafter carried on the butchering business, feeding his cattle up to 1894 upon the farm included in the deed,

105 F.—2

and peddled out the meat at different places, wherever he could find a market therefor. At the time of the execution of the deed the husband was indebted to Mr. W. W. Lapham in the sum of $1,500, for which a note had been previously given by him, and owed a few hundred dollars besides,—in all, about $2,000. At that time he owned about 35 head of horses, of the value of $150 each, and about 200 head of cattle, of the value of $5,000. After the execution of the deed the wife was anxious to repair the house where the family lived. The question as to whether the house should be simply repaired or enlarged was discussed by all members of the family. The younger members were decidedly in favor of having it enlarged. The wife requested her husband to engage a carpenter for her, which he did, and the carpenter was consulted about the changes to be made and expense that would be incurred. W. W. Lapham, a man of means, who had boarded with the family for about 20 years,—and, according to the testimony, they had "never taken a cent from him,"—offered to furnish the money. He said: "Mrs. Van, you deserve a better house. You have worked hard, very hard. * * * I will give you one thousand dollars, and fix your house in good shape. * * * I will not charge you any interest." She said: "I don't care about taking it. I do not like to go in debt. I like to see my way clear." After the carpenters commenced work, and the old dining room had been torn down, Lapham said: "Mrs. Van, I think it would be cheaper for you to move the old building back, * * * and build a new front altogether." She replied by saying: "I don't like to go into debt too much. * * * If you think it will not cost over one thousand dollars, I will try it." Lapham paid the bills, and the improvements cost nearly $1,500. After the work was finished, Lapham wanted her to sign two duebills. When she examined them she noticed the words "Vansickle ranch," and thought he was trying to include her husband and the ranch; that the property was hers, the debt was hers, and that her husband had nothing to do with it. She testified that she said to Mr. Lapham: "What do you mean by 'Vansickle ranch'? Do you include Peter with it?"—and told him: "I will never sign that. You could come to-morrow and sue me, and that is the thing I cannot stand. You promised to wait and have patience until I paid you; and if I paid you it was all right, and if I did not it was all right. Is that not the bargain?" Other words passed between them, and the duebills were not signed. This indebtedness, together with the note of $1,500, was afterwards, by some transaction between Lapham and P. W. Vansickle, included in the note of $4,000 executed by P. W. Vansickle in favor of W. W. Lapham on the 29th day of March, 1887; the same being the note assigned by Lapham to Wells, Fargo & Co., before maturity, and upon which the judgment in its suit against P. W. Vansickle was obtained. On the day that this note was signed P. W. Vansickle made, executed, and delivered to said Lapham a chattel mortgage upon certain personal property, to wit, 200 head of cattle and 20 head of horses, as security for the payment of the note. Vansickle was then engaged in business as a butcher, and, after the note was executed, permission was given to him by the holder of the note and chattel mortgage to kill the cattle and dispose of the other property. He did so, and made many payments on the note at different times. He always claimed that he had paid the note in full to Lapham. The taxes were always assessed against the land in the name of P. W. Vansickle, after the deed was executed, as before, until about 1899, when it was assessed to Mrs. Lillies M. Vansickle. Mrs. Vansickle testified that she never paid any attention to it; that the assessor never came to her for a statement; that her husband paid the taxes while he was in the butcher business, for the feed of his cattle on her farm. It further appears that the assessors were in the habit of copying the statements from the previous assessment roll; that they made no examination or inquiry into the title, and made no changes in the name of the party to whom the land was assessed, unless objections were made thereto, or the party in whose name it was assessed had died; that this was true generally of all property assessed in Douglas county by them. On November 20, 1866, the husband and wife joined in the execution of a declaration of homestead embracing the property in controversy, and this declaration thereafter, on December 4, 1866, was duly filed and recorded in Douglas county, where the land is situate. On June 11, 1895, they again joined in the execution of a second declaration of

homestead upon the same property, which was duly filed and recorded as above.

W. E. F. Deal, for complainant.

M. A. Murphy, for defendant.

HAWLEY, District Judge (after stating the facts). This is a suit in equity to enjoin the defendant from selling certain lands situate in Douglas county, Nev., under an execution issued May 21, 1895, upon a judgment obtained in this court December 12, 1894, by the defendant against P. W. Vansickle for $4,000, with interest and costs. Complainant claims to be the sole owner of the property under and by virtue of a deed executed and delivered to her by her husband, P. W. Vansickle, in 1886. It is alleged in the answer that P. W. Vansickle, being indebted to a number of persons, with full knowledge of his insolvency, "and for the purpose and with the intent to hinder, delay, and defraud his said creditors, including this defendant, made a pretended sale of the lands and premises described and set forth in the complainant's bill to the complainant, Lillies M. Vansickle, who then was, and for a long time prior thereto had been, and now is, the wife of the said Peter W. Vansickle; that no consideration ever passed or was paid by the said Lillies M. Vansickle to the said Peter W. Vansickle or any other person; * * * that at the time of the pretended transfer of said lands and premises by the said Peter W. Vansickle to the said Lillies M. Vansickle, his wife, she received and accepted said deed of conveyance well knowing the embarrassed financial condition of her said husband, Peter W. Vansickle, and the said deed was made and some time thereafter recorded, and at a still later date delivered by the said Peter W. Vansickle to, and accepted by, the said Lillies M. Vansickle, his wife, with the intent and for the purpose of delaying, hindering, and defrauding the creditors of the said Peter W. Vansickle." This averment raises the only issues involved in this suit: (1) Was any contract or agreement ever made between husband and wife under which the husband became indebted to the wife? (2) Was the deed which was afterwards executed by the husband made with the intent on the part of the husband and the wife to hinder, delay, or defraud the creditors of the husband?

There were several preliminary objections made which are purely technical, and but few that require special notice. For instance, an objection was made to the admission of the deed from the husband to the wife because it purports to have been made April 30, 1886, and to have been acknowledged and recorded April 26, 1886, and was not delivered until several weeks thereafter. It is evident that the insertion of the "30th day of April" as the day of its execution was a clerical mistake, which does not in any manner affect the validity of the deed. The fact that the deed was not delivered until after it was filed is wholly immaterial. The fact the property was assessed to P. W. Vansickle after the deed was executed and delivered, the same as it had been for years before, does not, in the light of the circumstances disclosed by the testimony of the officers and others concerning the manner in which assessments of real estate were made in

Douglas county, tend to show that the complainant was guilty of any fraud in regard thereto. The fact that the husband often paid the taxes is, I think, satisfactorily explained in the testimony, and need not be repeated.

It was urged upon the oral argument that there was no valid agreement existing between the husband and wife that could have been enforced in an action at law between them, and upon this point divers objections were made as to the manner in which the accounts were kept between the husband and wife, and as to the methods of all the transactions between them. It would be useless to mention these objections in detail. It is enough to say that they were not relevant to the issues involved herein. The defendant is not in a position to object to the manner and method of these transactions. If a contract or agreement existed between the parties whereby an indebtedness became due to the wife at the time of the execution of the deed, it does not lie in the mouth of another creditor of the husband to say that the husband might have defeated the transaction by legal technicalities that might have been urged because the accounts between them were not kept in "due and regular form," etc. In line with these objections is found the answer to the objection that the debts incurred were barred by the statute of limitations. That was a matter solely between the husband and wife. The privilege given by the statute could be waived. There is no law which prevents a party from paying an honest debt simply because he might have availed himself of the provisions of the statute. No stranger to the transaction could raise the question. Blair v. Silver Peak Mines (C. C.) 84 Fed. 737, 738; Hanchett v. Blair, 41 C. C. A. 76, 100 Fed. 817, 825, and authorities there cited. But the fact that some of the items relied upon to constitute the consideration might have been barred by the statute was admissible, because, if it were shown that no efforts had ever been made to collect or enforce the claim, it would furnish a circumstance to be considered on the question of good faith. Schuberth v. Schillo, 177 Ill. 346, 350, 52 N. E. 319. It was, of course, the duty of the court to be liberal in the admission of testimony as to the various transactions, and consider all the evidence in regard thereto, in so far as it has any bearing upon the question of the good faith of the parties, or as to whether or not the deed was made for the sole purpose of hindering, delaying, or defrauding creditors. It would serve no useful purpose to refer to any of the other objections urged to the admission of the testimony.

There is no substantial ground urged against the validity of the homestead claims upon the property. The contention is over the question whether the defendant has the right, under its execution, to sell the property and take the proceeds in excess of the amount allowed as exempt under the homestead claim. But the filing of the second declaration of homestead after the execution and delivery of the deed is claimed to be a circumstance to be considered by the court, as tending to show some fraudulent design on the part of the parties; and in this connection counsel asks, if the previous transactions were bona fide, "why did Mrs. Vansickle, years after she had the deed, join with her husband in the declaration of a homestead?" The evidence

shows that she was advised to do so by an attorney. This advice may have been given as a matter of precaution, to save any question that might ever be raised as to the effect of the proviso contained in section 1 of the "act to exempt the homestead and other property from forced sale in certain cases, approved March 6, 1865," as amended in 1879, which reads "that if the property declared upon as a homestead be the separate property of either spouse, both must join in the execution and acknowledgment of the declaration." Laws Nev. 1879, c. 131, § 1. But, whatever the object or purpose may have been, it certainly cannot be considered as a circumstance which tends to establish any fraudulent intent upon the part of either in the execution and delivery of the deed. The fact that the wife, after as well as before the execution of the deed, often gave the husband money to pay his debts; that he lived upon the premises; and that she never charged him for his board, because, as she testified, "he is my husband, and he shall always have a home,"—is not of itself a circumstance from which fraud could be inferred. As was said by the court in Ravisies v. Alston, 5 Ala. 297, 303, in referring to similar facts, "If the sale was fair and the purchase bona fide, the facts supposed, instead of being a badge of fraud, entitle the parties to commendation."

Replying to the contention of the defendant that as the wife did not file an inventory of the property conveyed by the deed, as required by the statute, the court should hold that it is community property and liable for the debts of her husband, it is sufficient to say that the property which the wife acquired under the agreement did not, after the execution of the deed, belong to the community property of husband and wife, but was her own individual, separate property, and that the provisions of sections 3 and 4 of the "act defining the rights of husband and wife," requiring the wife to file a full and complete inventory of her separate estate, do not, in my opinion, have any bearing whatever upon any issue involved in this suit. Section 5 of the act, which provides the only penalty for such failure, relates exclusively to controversies "between the wife and purchasers in good faith and for a valuable consideration from the husband." Cutting's Comp. Ann. Laws Nev. §§ 512-514. The defendant stands in no such relation, and is not in a position to claim any right in the premises on account of the failure of the wife to file an inventory of her separate property. It certainly cannot be claimed that her failure to file such an inventory constitutes in the slightest degree any indicia of an intent on her part to hinder, delay, or defraud any creditor of her husband.

It is unnecessary to examine or review the numerous authorities cited by defendant based upon the rules which prevailed at common law. At common law contracts between husband and wife were held void, for the want of the wife's power to consent. The civil existence of the wife was considered, for many purposes, as being merged in that of her husband, and her services belonged absolutely to him. Nevertheless it will be observed that the courts of equity in England protected, as far as they could, the separate estate, savings, and earnings of married women; and many cases can be found where contracts and agreements between husband and wife of a

similar character to the one proven by the testimony in this suit were upheld and maintained under the strictness and rigidity of the common-law rules. In the early case of Slanning v. Style, 3 P. Wms. 334, 337, decided in 1734, where it was insisted on behalf of the defendant that the testator allowed his wife—

"To dispose and make profit of all such butter, eggs, poultry, pigs, fruit, and other trivial matters arising from the said farm (over and besides what was used in the family), for her own separate use, calling it her 'pin money'; * * * and it was proved in the cause that her husband, whenever any person came to buy any fowls, pigs, etc., would say he had nothing to do with those things, which were his wife's, and that he also confessed that having been making a purchase of about £1,000 value, and wanting some money, he had been obliged to borrow £100 of his wife to make up the purchase money. Therefore now the widow claimed to be paid this £100."

The lord chancellor, in decreeing that the widow was entitled to this £100, said:

"That the courts of equity have taken notice of and allowed feme coverts to have separate interests by their husbands' agreement; and this £100 being the wife's savings, and here being evidence that the husband agreed thereto, it seemed but a reasonable encouragement to the wife's frugality, and such agreement would be of little avail, were it to determine by the husband's death. That it was the strongest proof of the husband's consent that the wife should have a separate property in the money arising by these savings, in that he had applied to her, and prevailed with her to lend him this sum, in which case he did not lay claim to it as his own, but submitted to borrow it as her money."

In Peterson v. Mulford, 36 N. J. Law, 481, 486, the court said:

"There can be no question but that a husband is entitled to the services of his wife, if he claims them, and also to the proceeds of her labor, unless he permits her to labor for her own account, or, after she has earned or received the proceeds, gives them to her, or allows her to appropriate them to her own use."

But, without reference to the rules of the common law, this suit must be considered and decided under the provisions of the statutes of this state and general principles of the law applicable to the facts which the evidence herein establishes. Section 15 of the "act defining the rights of husband and wife, approved March 10, 1873," provides as follows:

"When the husband has allowed the wife to appropriate to her own use her earnings, the same, with the issues and profits thereof, is deemed a gift from him to her, and is, with such issues and profits, her separate property."

Section 19 of the same act reads as follows:

"Either husband or wife may enter into any contract, engagement, or transaction with the other, or with any other person, respecting property, which either might enter into if unmarried, subject in any contract, engagement, or transaction between themselves, to the general rules which control the actions of persons occupying relations of confidence and trust towards each other."

Cutting's Comp. Ann. Laws, pp. 121, 122, §§ 524, 528.

Under these provisions of the statute, independent of any authority upon the subject, it seems to my mind clear that the parties had the unquestioned right to make the agreement that the wife, in consideration of her extra services, might and should have the money realized from the sale of the butter, chickens, and eggs, and that the moneys appropriated by the husband out of this fund belonged to the

wife, as well as the money which she had realized from these sources and loaned to her husband, and created between them an indebtedness which constituted a valuable consideration for the execution and delivery of the deed. In Peterson v. Mulford, supra, Roche v. Trust Co. (Ind. Sup.) 52 N. E. 612, 616, 617, and Nuding v. Urich, 169 Pa. St. 289, 292–294, 32 Atl. 409, there is an able and exhaustive discussion of the relative rights of the husband and wife upon this subject, and many authorities are there cited. It is enough to say, without quoting therefrom, that they are directly applicable to the facts of this case, and that the conclusions therein reached fully support the views I have expressed. The authorities cited by the defendant are based upon facts which are entirely dissimilar to the facts in this suit, and many of them are based exclusively upon the ground that no agreement was ever made that the wife should have any recompense for the extra services she had rendered.

Was the transfer of the property made to hinder, delay, or defraud the creditors of P. W. Vansickle? Under the provisions of the statute of this state, all conveyances made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, debts, or demands are, as against such persons, utterly null and void. Cutting's Comp. Ann. Laws, § 2708. It is well settled that fraud may be shown, in conveyances of property made to hinder, delay, or defraud creditors, by the conduct and appearance of the parties, the details of the transaction, and the surrounding circumstances, and may be inferred when the facts and circumstances are such as to lead a reasonable man to believe that the property of a debtor has been attempted to be withdrawn from the reach of his creditors. Thomson v. Crane (C. C.) 73 Fed. 327, 329, and authorities there cited. The statutes of this state (Cutting's Comp. Ann. Laws, § 2711) provide that:

"The question of fraudulent intent, in all cases arising under the provisions of this act, shall be deemed a question of fact, and not of law; nor shall any conveyance or charge be adjudged fraudulent, as against creditors or purchasers, solely on the ground that it was not founded on a valuable consideration."

With reference to the facts established by the evidence, it is proper to say that all the testimony was taken in open court; that the court had the opportunity of observing the manner and appearance of the respective witnesses, and thus is better enabled to decide as to the weight and credence that should be given to their testimony. The fact is that there was no substantial conflict in the evidence. The difference in the statements of the respective witnesses concerning the various transactions, and the slight discrepancies as to the language used by the parties to the transaction, upon which much stress is laid by counsel, are readily accounted for by the lapse of time, and the differences that would naturally occur in the memory of the witnesses. To my mind, the fact that the transactions were differently stated from their recollection, instead of being given with a parrot-like sameness, strengthens, instead of weakens, the force of their evidence as to the bona fides of these transactions. The power of the husband to deed his property to his wife is unquestioned. The mere fact that the husband was at the time of the execution of the

deed indebted to other parties does not of itself raise any presumption of fraud, or constitute any ground for the impeachment of his acts. The rule is well settled that a conveyance giving such preference is not fraudulent, though the debtor be insolvent, and the creditor be aware at the time that it would have the effect of defeating the collection of other debts. Wheaton v. Neville, 19 Cal. 42, 46; Ross v. Sedgwick, 69 Cal. 247, 250, 10 Pac. 400; Lucas v. Clafflin, 76 Va. 269, 277; 14 Am. & Eng. Enc. Law (2d Ed.) 224, and authorities there cited. The validity of the conveyance is to be determined, not by its effect, but by the intention with which it was made. In the absence of any statutory provision forbidding preferences, a debtor has the right to convey his property to any one or more of his creditors. The fact that the preference is given to his wife, or to any other relative, between whom and himself there subsists the relation of debtor and creditor, does not prohibit him from preferring such creditor in the payment of his debts. 14 Am. & Eng. Enc. Law (2d Ed.) 232, and authorities there cited. It is, of course, the duty of the court in all such cases, as in all cases where fraud is alleged, carefully to scrutinize the testimony of the witnesses, and keep in mind the family relations of the parties; but the determination of the case must, at last, as was said by the court in Shauer v. Alterton, 151 U. S. 607, 626, 14 Sup. Ct. 448, 38 L. Ed. 292, "depend upon the inquiry whether the transaction was honest and bona fide." This is the crucial test in all cases. It may be that fraudulent dispositions of a man's property to his wife or to members of his family are more frequently made than to others not so intimately connected; but where the transaction is manifestly honest and bona fide, and not made to hinder, delay, or defraud other creditors, too much stress ought not to be given to the fact of their intimate relationship. For, as before stated, the mere fact that the deed of the property was made to a relative is not of itself a badge of fraud. The books are full of cases where this general principle has been announced. Moreover, if the conveyance was not fraudulent in its inception, it will not be made so by any subsequent conduct of the parties. 14 Am. & Eng. Enc. Law (2d Ed.) 269, and authorities there cited. The weight of the testimony, taken in its entirety, establishes the fact that the conveyance to the wife was made bona fide, for a good and valuable consideration, without any intent on the part of the parties thereto to hinder, delay, or defraud any creditor of the husband. So far as the wife is concerned, there is no pretense that she was guilty of any fraud, though perhaps mistaken in some of the facts concerning Lapham's $1,500 note. She was honestly of the opinion that the note had been paid, and there is no circumstance or testimony of any kind to indicate that she accepted the deed for the purpose or with the intent of hindering, delaying, or defrauding any creditor of her husband. To make a conveyance fraudulent, fraud or fraudulent intent must be shown on the part of the grantee as well as on the part of the grantor. Cohen v. Knox, 90 Cal. 266, 273, 27 Pac. 215, 13 L. R. A. 711; Priest v. Brown, 100 Cal. 626, 634, 35 Pac. 323; Newman v. Cordell, 43 Barb. 449, 457; Meyer v. Sulzbacher, 76 Ala. 120, 128; Jenkins v. Einstein, 3 Biss. 128, Fed. Cas. No. 7,265; Magniac v.

Thompson, 7 Pet. 348, 393, 8 L. Ed. 709; 14 Am. & Eng. Enc. Law (2d Ed.) 270, and authorities there cited. In Prewit v. Wilson, 103 U. S. 22, 24, 26 L. Ed. 363, Mr. Justice Field, in delivering the opinion of the court, said:

"When a deed is executed for a valuable and adequate consideration, without knowledge by the grantee of any fraudulent intent of the grantor, it will be upheld, however fraudulent his purpose. To vitiate the transfer in such case, the grantee also must be chargeable with knowledge of the intention of the grantor."

In Garr, Scott & Co. v. Klein, 93 Iowa, 313, 315, 61 N. W. 919, which was a suit in equity to set aside a conveyance of real estate between husband and wife, and to subject the property conveyed to the payment of a judgment owned by the plaintiff, the lower court found in favor of the defendant, and the judgment was affirmed. The language of the court fits like a glove to the facts of this case, and is as near on "all fours" with it, as any cases ever get. The court said:

"We are satisfied that the conveyance was made in pursuance of a valid agreement between the husband and wife, entered into in good faith, for a lawful purpose. The plaintiff relies in part upon alleged statements of the husband made about the time the judgment against him was rendered, and also before that time, to the effect that the claim of the plaintiff was not just, that the plaintiff could not recover anything of him, and that his property was beyond its reach, and upon the relationship of the parties to the conveyance, as showing that it was fraudulent. But, if such statements were made by the husband, they would not be sufficient to taint the title of the wife with fraud. She denies that she knew of the indebtedness to the plaintiff at the time the deed was made, and her testimony to that effect is not shown to be incorrect. Since the consideration for the deed was ample, and was paid some time before the delivery of the deed, the fact that it was not delivered to her personally until after the judgment was rendered is immaterial. We have read the record and argument for the appellant with care, and although there are some facts which, if unexplained, would be deemed badges of fraud, yet, when all relevant facts are considered, we do not find any ground upon which the judgment of the district court can be disturbed."

The views we have expressed, and the conclusions we have reached, are not, as defendant claims, "throwing temptation in the path of integrity and truth," but, on the contrary, are calculated to preserve the ends of justice, and uphold the rights of parties to make agreements, and protect them therein, when made in good faith and for a valuable consideration, without any fraudulent intent. Let a decree be entered in accordance with the prayer of complainant's complaint.