## HENRY UHLICH

### v.

## JOHN M. MUHLKE et al.

### and

## JOHN H. MUHLKE et al.

### v.

## HENRY UHLICH.

1. PRINCIPAL AND AGENT—*of dealings between them—and herein, of the burden of proof in relation to the fairness of the transaction.* Where a conveyance is made to the confidential agent and adviser of the grantor, it is not void merely by reason of the relation thus existing between the grantor and the grantee.

2. Nor does it devolve upon the grantee, standing in this relation, to prove, in the first instance, that he did not use the influence he possessed over the grantor to induce the deed—that he did not abuse the confidence reposed in him.

3. A confidential relation gives cause of suspicion, and the circumstances under which a deed is made during such a relation, must be closely scanned; and if a reasonable suspicion exists that confidence has been abused where reposed, the deed should be set aside.

4. But the suspicion may be removed; and to render such a transaction valid, it is only necessary to show that the other party had competent and disinterested advice, *or*, that he performed the act, or entered into the transaction, voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power and influence to which the relation might be supposed to give rise.

5. A gift by one to another, who has been for many years his confidential agent and adviser, is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood to the donor.

6. ADEQUACY *of consideration—fraud.* A person owning a large and valuable property in the city of Chicago, obtained the services of another as agent and confidential adviser, in the management of the estate. After four years' service of an important character, to the principal, for which the agent had received no compensation, the former conveyed to the latter an undivided one-third of the property, of the value of about $125,000, the deed reciting a consideration of $12,000, and "for other good and valuable

considerations." There was no money paid by the grantee, the only consideration for the conveyance being such services as he had rendered and such as he agreed to render, in the matter of the management of the estate. At the time of the conveyance there was an incumbrance upon the entire property, amounting to $36,000, the conveyance being made subject to one-third of the same. Simultaneously with the execution of the deed, the grantee entered into a covenant to continue his services in the matter of the estate committed to his care, even after the death of his grantor; and if he himself should die, he covenanted that his successors after him, at the expense of his estate, should render them. At the time of the transaction the grantee was engaged in a large and remunerative mercantile business, by which he had already acquired property estimated at $50,000; and soon after he made the covenant mentioned he closed his connection with that business in order that he might bestow his entire time upon the business of his employer. Upon the objection in a suit by one of the children and devisees of the grantor, that the consideration for the deed was so grossly inadequate that a court of equity ought to set it aside as fraudulent, it was *held*, there was adequate consideration for the deed, and it was valid.

7. PARENT AND CHILD—*absolute power of disposition of property by the former*. The owner of property has a right to convey it to whom he pleases, there being no creditors; he may impose conditions upon any one of his grantees, to make the deed to him inoperative; he may judge who are the proper objects of his bounty, and, if free from insane delusion or senile dementia, passing by his own children, give it to aliens to his blood. A child has no natural right to the estate of his father—no such right as can be asserted against the testamentary disposition of the estate by the father.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

Mr. WM. K. McALLISTER, Messrs. NISSEN & BARNUM, and Mr. I. N. STILES, for Henry Uhlich.

Messrs. GOODRICH, FARWELL & SMITH, for Muhlke *et al.*

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:*

This was a bill in chancery in the Superior Court of Chicago, exhibited by Henry Uhlich against John H. Muhlke, Ernst Uhlich, August Uhlich and Walter Newberry, to set aside certain deeds described in the bill, on the allegation they were fraudulently obtained, and were null and void, for the reasons, first, that the grantor was of weak and unsound mind at the time of their execution and delivery; second, that Muhlke obtained the first deed to himself, in abuse of the trust and confidence reposed in him by the grantor, by fraud and undue influence, without paying a consideration, or an inadequate consideration; third, that all the other deeds were obtained by fraud and undue influence while the grantor was of weak and unsound mind; fourth, that all the deeds were obtained through fraud and conspiracy, having for its object, on the part of Muhlke and Ernst Uhlich, by undue influence, not only to obtain a large share of the property of Carl Uhlich, to the exclusion of complainant and August Uhlich, but also fraudulently to obtain from complainant conveyances confirmatory of such frauds, and further assurance of the title to the lands thus fraudulently obtained by them, and to deprive complainant of the property which was given to him, and to obtain, in addition, covenants of warranty from him of their title; fifth, that the deed from complainant and wife was not only obtained from them by fraud, but is without consideration, and executed and delivered by them under a mistake of law as well as of fact, and under threats and compulsion.

---

*This cause was originally decided at the September term, 1869, and Mr. CHIEF JUSTICE BREESE delivered the opinion of the court. Subsequently a rehearing was granted, and the cause was heard at the September term, 1871, before the full bench of seven judges, as the court was organized under the new constitution, when an additional opinion was filed, in which a majority of the court adhered to the original opinion. Mr. JUSTICE MCALLISTER, who was of counsel on the first argument, took no part in the decision or in the conduct of the cause on the rehearing.

Subsequent to the delivery of the original opinion, and prior to the rehearing, Mr. JUSTICE LAWRENCE became Chief Justice.

The bill prays, not only that these deeds be set aside, but, also, for a partition of the estate conveyed by them; for an account of rents and profits; for an injunction; for the appointment of a receiver to collect the rents during the pendency of the suit; for an order to compel Muhlke and Ernst Uhlich to produce in court, and deposit with the clerk, all papers, documents, etc., of Carl Uhlich, deceased, and all title deeds, bonds, mortgages, etc., relating to the lands described in the bill, and for general relief.

Newberry was a formal party only, and answered accordingly.

A separate answer was put in by Muhlke, and a joint and separate answer by Ernst and August, to the bill.

In Muhlke's answer, it was alleged that, on the 6th of July, 1861, Carl Uhlich made a will devising therein certain property to the complainant, and to his other sons, Ernst and August, and to his wife, all the rest of his real and personal property, making Mrs. Uhlich and Muhlke executors, and revoking all former wills.

It is also alleged in the answer of Muhlke, that, after the death of Mrs. Uhlich, which occurred in June, 1867, Carl, on the 10th of July of that year, executed another will, giving to his three children certain interests in land, and to Muhlke a certain interest, and to John G. Harmon and others as trustees, a tract of land on which to erect an orphan asylum— Muhlke to be sole executor, not required to give bond, and revoking all former wills. Neither of these wills was ever offered for probate.

The answers of the defendants deny all the allegations of the bill charging fraud, undue influence, or any improper conduct, in procuring the deeds to be made, or that they did procure them to be made, and deny all matters charged in the bill going to impeach the honesty and fairness of the transactions on which the charges are based, giving a full history of Carl, his wife, and of the various parties to the proceeding, and denying unsoundness of mind of Carl Uhlich.

To the answers, replications were filed, but, by leave of the court, they were withdrawn, in order to enable the complainant to amend his bill to meet the allegations of the answers in respect to these several wills of Carl Uhlich.

Complainant charges, that the first will was made whilst Carl was of weak, imbecile, unsound mind and memory, and was obtained and effected, by Ernst, August and Muhlke, by fraud and undue influence; and that the last supposed will was effected and obtained by fraud and undue influence exercised by Muhlke, Ernst and August, upon the weak and unsound mind of Carl, and in pursuance of and as part of a scheme and conspiracy to procure an unjust and inequitable division, among themselves, of the estate of Carl, and that both wills are void and inoperative.

The replications were again filed, and the cause came on for hearing on the bill, answers, depositions, exhibits and oral proofs.

The court decreed substantially as prayed, except as to the deed executed by Carl Uhlich and wife to Muhlke, dated March 20, 1865, which was adjudged to be valid. The court also adjudged the will of July 6, 1861, to be a valid will.

From this decree complainant, on his part, and Muhlke and Ernst Uhlich, on their part, appeal to this court, and assign various errors.

The testimony and pleadings in the cause make a large volume. The abstract of the record occupies two hundred and twenty-one pages, and the record itself twelve hundred and fifty printed pages, large folio. This mass of matter has been fully examined and considered, and also the elaborate opinion of the learned judge who tried the cause, and we will proceed to state the impressions they have made upon our minds, and what conclusions they have induced.

We shall consider the appeals together, they being so intimately connected.

504      UHLICH *v.* MUHLKE *et al.*      [Sept. T.,

Opinion of the Court.

It is not to be expected that we shall state in detail the evidence, but only the impressions it has made, the conclusions to which it has led, and the law applicable thereto.

We will first consider the deed of March 20, 1865, from Carl Uhlich and wife to Muhlke, as that is first attacked by complainant.

It is insisted this deed is null and void, having been fraudulently obtained, Carl having been, at the time of its execution, of weak and unsound mind; and also, that it was obtained by Muhlke in abuse of the trust and confidence reposed in him, by fraud and undue influence, without paying a consideration, or an inadequate consideration.

These propositions will be considered together. The first has no support from the evidence. There is not a particle of proof, as we understand it, that, at the time the deed was made, the grantor was of weak and unsound mind. On the contrary, it is shown he was a man of more than ordinary intellect, fully understanding his position, and the extent and value of his property and its condition, and fully capable of appreciating the services Muhlke had rendered him in the management of it.

The second proposition is the important one. The grantee did sustain, at the time the deed was made, and had, for more, than four years previous thereto, sustained the relation of confidential agent and adviser of the grantor.

What, then, is incumbent on the grantee to show to validate a deed executed and delivered under such circumstances? Such a transaction comes under the head of "constructive frauds," and is so treated by law writers. The principle on which courts of equity act, in regard to such cases, is a motive of public policy, and designed, in some degree, as a protection to the parties against the effects of overweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment, 1 Story's Eq. Jur. sec. 307; and in sec. 308, it is further said, "if a confidence is reposed, and that confidence is abused, courts of equity will grant relief."

A few considerations must, we think, satisfy the most in-credulous mind, that Muhlke, in accepting this deed, abused no confidence which Uhlich, the grantor, had reposed in him.

Complainant, in his bill, does not allege any act done by Muhlke, whilst this relation existed, tending to show any ad-vantage taken by him of that relation, but the broad ground is assumed that the relation itself forbids such a transaction, and advantages taken will be presumed.

The great body of the evidence shows that Uhlich, in 1860, entertained apprehensions, his estate having become very large and valuable, of his own inability to manage it, then considera-bly embarrassed, and likely to become more so, by inattention, or by the want of the requisite vigilance and skill. He had three grown sons, but neither of them capable of rendering any assistance. He was then near eighty years of age, with a wife more than sixty, to whom he was much attached, pos-sessed of good sense and devoted to him and to his interests, and on whose kindness and judgment he relied. The times were portentous of great and disturbing events, and their angry threatenings were calculated to, and did, inspire alarm in the whole business community. Uhlich had been involved in the storm which passed over him in 1857, and had emerged from it in debt, and in arrears in interest due on borrowed money. His property, though large, was, for the most part, unproductive, yielding him a revenue barely sufficient to pay the annual taxes and occasional assessments upon it. Every sign was unpropitious, and he was in a state of great dismay and distress. In this emergency he called upon Mr. Hartman, the pastor of a religious congregation of which he was a member. He was in embarrassments which he deemed inextricable. In this dilemma, his pastor advised him to pro-cure the services of some competent man of business, to whom he should give the management of his property, and recom-mended the defendant Muhlke, a member of their church, as a proper person.

Mr. Hartman's account of this is so plain and simple and natural, that we quote from his testimony. He says: Father Uhlich came to him in his study; it was a cold day; he had in his pocket a bundle of papers, seeming to be deeds, or policies of insurance, or legal documents, and said, "I am in great trouble; I am sold and betrayed by my own flesh and blood, and by my legal advisers," meaning his lawyers; said he had brought a great deal of money to this country, and had lost, since that time, many thousands; said he had lost five thousand dollars by one bank, and that he had so many expenses and taxes to pay, and that all the land he had did not yield him much; that he had many debts; that he did not understand the laws and language of this country; that he had no competent friend in this country to whom he might confide his affairs, and that he feared he might become a poor man if things continued in the manner they were. He then asked Mr. Hartman, as his pastor, or spiritual adviser, to indicate to him a competent and experienced man, or an attorney, or a friend to whom he might entrust the management of his affairs and property, and if he did not know of any such person, then the leading men of the congregation should see to him in his embarrassment. Mr. Hartman told him he could not do anything for him, nor could the congregation, but told him he should go to Mr. Muhlke and entrust his matters to him, giving a promise that he would see Mr. Muhlke and speak to him about it. Mr. Uhlich was satisfied, and said he would go and see Mr. Muhlke about it, and not neglect it.

In answer to the question, did Mr. Uhlich, at this interview, say anything else with regard to who had sold and betrayed him, he replied, yes, his son—his flesh and blood—as he understood, his son who was managing his affairs.

Mr. Hartman spoke to Mr. Muhlke several times about looking into Uhlich's affairs, and besought him, in God's name, to help him. Muhlke refused for a long time, and it was only by the importunity of Mr. Hartman he finally resolved to accept the position; that his partner in business was

dissatisfied, that he was always attending to other people's business.

After Muhlke looked into the business, which he found very complicated, and when he was assisting Uhlich, Mr. Hartman says that Uhlich expressed much gratification, and said if he had had Muhlke from the beginning, under his management he would have been one of the richest men in the city, and could have accomplished all his plans in the old country as well as in this, in regard to benevolence.

It would seem, from Mr. Hartman's testimony, that Uhlich had a plan concerning a school in his native village in Saxony, of which he was one of the founders, which he designed to endow with ten or twenty thousand dollars, and a similar one in this country. He had always schools and orphan asylums in his mind, and said that money was a misfortune to people, and that it was the greatest happiness which could be received to a people to have a good education.

To understand Uhlich's remark about his being sold and betrayed by his own flesh and blood, it is proper to state that, in 1856, he had commenced the erection of a hotel on his property on State street, and had employed the complainant, at wages, to assist him, and after it was completed, employed him to assist in keeping it. In August, 1860, he discharged complainant, it would seem, from a want of confidence in him, and under the belief he was neglecting his business, and was intemperate in the use of intoxicating liquors; at any rate, the father ceased from this time forth to have any confidence in complainant, or much affection or respect for him.

To understand the allusion to the dissatisfaction of Mr. Muhlke's partner, it is necessary to say, Mr. Muhlke was then in a profitable mercantile partnership in the sale of dry goods on State street, from which he was realizing remunerative profits, and which bade fair, in time, to bring him more than a competency.

It was "a cold day" when Uhlich made this call upon his pastor "in his study." In November, 1860, Mr. Uhlich's

bankers had failed, having in their hands more than five thousand dollars of his money, for the security of which he had eighty acres of land, then worth much less than the amount owing to him. It must have been, then, in the last of that month, or in the next succeeding month of December, that Mr. Muhlke was applied to to look into Uhlich's affairs. He, it appears, was an unexceptionable man in every respect, standing well in the mercantile community, and enjoying the confidence of all his acquaintances; was a German by birth, but Americanized by a long residence in Chicago; understood English well, and was a competent adviser to all his country-men who might, and did, come to him for advice in all business matters in which they were interested. Much of his time was consumed in this way, and it is not surprising he should have hesitated, having his own business to attend to, to look into the complicated affairs of Uhlich.

At this time, or shortly after, certainly as early as January, 1861, Uhlich looks to Muhlke for advice, and, under the active energies of his mind, his adaptation to comprehend and manage a large estate, soon order took the place of confusion, and the estate of Uhlich was put upon such a footing as to yield large revenue for succeeding years, his debts were paid, and peace, tranquility and contentment reigned, where so long distrust, embarrassment and despondency had prevailed. That much of this was due to the vigilance, skill and fidelity of Muhlke, there can be no doubt on the evidence, and that he was to those old people "a guardian angel" is so true that this term which they gave him can scarcely be considered an hyperbole.

Muhlke continued his attention to the business, though engaged in mercantile pursuits of his own, from January, 1861, without compensation being mentioned by either of the parties, Uhlich occasionally making to him valuable presents. All that was done, however, was under the supervision of Uhlich himself, Muhlke being his adviser only, and acting

only with the approval of Uhlich. Thus money was bor-
rowed, and to large amounts, by Uhlich, under the advice of
Muhlke, and used by the latter in valuable improvements, af-
fording almost princely revenues.  In short, all that man could
do, aided by fortuitous circumstances, was done by Muhlke
to improve the estate and make it productive, and he was suc-
cessful, giving quiet to old hearts near breaking, and causing
precious drops to flow, where before ran only bitter tears.

Thus matters continued, and thus were the relations of
Uhlich and Muhlke up to the date of the deed in question,
March 20, 1865.  For four years and more, compensation had
not been mentioned.

In July, 1861, Uhlich made his will, drawn up by Far-
well & Smith, with whom had been before associated in busi-
ness, and since, Mr. Goodrich, of whose family, when a boy,
Muhlke had been a member, and who, on one or more occa-
sions, had been his legal adviser in cases not personal to
Muhlke.  There is no doubt a mutual confidence existed be-
tween them.  By this will, the bulk of the property was de-
vised to Mrs. Uhlich, and Muhlke appointed executor, without
giving any security.

On the 20th of March, 1865, Uhlich and his wife, with
Muhlke, went to the law office of Goodrich, and, staying a few
minutes, Muhlke went away, leaving the old people with Mr.
Goodrich.  This gentleman spent some hours with them in
ascertaining their wishes and in drawing the deed and an agree-
ment.  The papers were fully explained by an interpreter
present, the clerk of Goodrich, Farwell & Smith, and they
understood them.  Muhlke returned to the office after the
papers had been drawn and explained, and took no part in the
transaction except in assisting the interpreter, at his request,
in explaining the location of the property described in the
deed, whereupon the papers were executed by the parties.

The deed by Uhlich and wife conveyed to Muhlke an undi-
vided one-third of real estate in Chicago, of the value of
about one hundred and twenty-five thousand dollars.

510          UHLICH *v.* MUHLKE *et al.*          · [Sept. T.,

Opinion of the Court.

These are all the circumstances attending the execution of the .deed, of which any direct proof is afforded. The grantors in the deed are dead, and the rules of law, when this cause was tried, did not permit the grantee to speak. From them we are called upon by complainant to say that the deed is null and void, by reason of the relation then existing between the grantor and grantee, the latter being the confidential agent of the grantor.

We have examined the rule of equity invoked by the complainant, as applicable to such cases, and no commentator on the principles of equity, and no reported case, goes to the extent of saying that, by force of such relation, a deed is *ipso facto* void. If such was the rule, a grateful man, to whom important services had been rendered, whose estate had been saved from ruin by a friend who had not stipulated for any compensation, would be prohibited from receiving any testimonial of the gratitude of the other. Kindness, important services, and friendship to the distressed, would be under a legal ban. A man, in the full possession of his faculties, would be prevented from selling or giving away any portion of his large estate to one by whose advice and counsel it had been rescued from ruin. It is difficult, at all times, to prove a negative—to prove that a grantee, standing in this relation, did not use the influence he possessed over the grantor to induce the deed; that he did not abuse the confidence reposed in him; nor does the rule require it. Kerr on Fraud, 103.

A confidential relation gives cause of suspicion, and the circumstances under which a deed is made during such a relation, must be closely scanned; and if a reasonable suspicion exists that confidence has been abused where reposed, the deed should be set aside. Suspicion may be removed, and when the circumstances attending this transaction are closely scanned, not a scintilla of doubt can remain that the whole thing was the outpouring of grateful hearts to the best and most cherished friend they had on earth, and who had raised them up from misery to happiness. The property was their own; they

had a right to do with it as they pleased, and after giving away one-third, as some recompense to their friend, they had enough remaining to make them very rich, and more than they knew what to do with.

We think the established facts of this case remove all suspicion of abuse of confidence, or of fraud, constructive or actual.

To render such a transaction valid, it is only necessary to show that the other party had competent and disinterested advice, *or* that he performed the act, or entered into the transaction, voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power and influence to which the relation might be supposed to give rise. Kerr on Fraud, 104, and the many cases cited under note (1).

It can not be pretended, in this case, that the grantors in this deed did not act voluntarily, deliberately and advisedly, well knowing the nature and effect of the act. Can it be doubted these aged people, between whom the closest confidence existed, who both loved Mr. Muhlke, who fully appreciated his services, who knew he had never demanded any recompense, who had no child or children on whom their best affections centered, who were oppressed by the magnitude of their own wealth, made great by Muhlke, that they had talked over the subject of compensation, in the form it finally assumed, many a time? There can be no doubt about it. No one has impeached the mental soundness of Mrs. Uhlich, or questioned her capacity, or believed that she was *ignorant of* the position she and her husband occupied towards Muhlke, and that she was his adviser in this matter there can be but little doubt. Were they alive to speak, they could doubtless tell how many hours, day and night, they had taken sweet counsel together as to the manner and form in which they should compensate their benefactor and "guardian angel." Having more than enough for themselves, and desiring to secure Muhlke's services when she should be a widow, which

was then probable, how natural was it for them to cause the compensation to assume the form it did.

As ground for supposing this deed was the result of undue influence by Muhlke, arising out of his relation to Uhlich, it is said by complainant, the old gentleman was involved in a church connection, the power of which was brought to bear upon him in favor of Muhlke, who was a member of the same church.

We have already quoted some of the testimony of Mr. Hartman, the pastor of the church, and fail to perceive anything in it, or in that of any other witness, to justify such a belief; nor does any portion of his testimony raise such a suspicion. He told Uhlich, when he applied to him for advice, that neither he nor the church could help him; that he must get Mr. Muhlke, who was a man of business. Here, certainly, is no church pressure upon him. As was natural in his affliction, he applied to his pastor for advice, and that is all.

It is also said that Muhlke caused the removal of the old people from the south to the north side, placing them upon a lot adjoining his own, in a new house he caused to be built for them with Uhlich's money, in order to withdraw him from intercourse with his sons and friends residing on the south side, and with a view to get them more completely in his power.

We do not think the evidence sustains this view. It is apparent, from the facts attending this removal, that Uhlich's motive in removing was to render more easy the intercourse which was becoming more and more necessary between him and his agent. His residence on the south side was four miles distant from that of Muhlke, and in a neighborhood not then very desirable, there being more drinking saloons than school houses or churches, to which his sons, August and complainant, could have ready access.

Muhlke's motive may be ascribed to the fact that, as he had become Uhlich's agent, in managing a large estate, frequent consultations were necessary, and which could be more readily

had with his principal on an adjoining lot.      There is no ground
for charging improper motives in this particular.

Upon the other ground, we do not perceive that Muhlke at
any time exaggerated the extent and value of his services to
Uhlich, with a view to a great reward from him, or that he
boasted of them at all.      It was Uhlich who did this, and he
had good cause.

We concur with the learned judge who tried this cause in
the Superior Court, that this deed was the free and voluntary
act of Mr. and Mrs. Uhlich, there being no constraint or in-
timidation shown, or abuse of confidence.      It is also in proof
that, years after its execution, the grantors, on several occa-
sions, when with their friends, not connected with or under the
influence of Muhlke, expressed their satisfaction that they had
executed this deed, and that, in their opinion, Muhlke de-
served all he had received, and it was further ratified, impliedly
at least, by Uhlich, when he subsequently executed the deeds
disposing of his property in September, 1867, for at that time
he made no disposition of the property included in this deed,
considering it as the property of Muhlke.

It is perhaps true, as urged by complainant, many men could
have been found in Chicago who would have attended to
Uhlich's business for four or five thousand dollars a year, and
yet that very man so employed might have swamp'd the whole
estate in half that time.

It was the good fortune of Muhlke to possess energy, fidel-
ity and business talents, and his praise that he employed them
all for the best interests of his constituent.      Why shall he not
have a recompense?

But it is further insisted by the complainant, that the deed
bears the impress of a sale, and being for the expressed con-
sideration of twelve thousand dollars, carries a falsehood on
its face, and that the unusual clause, "and for other good and
valuable considerations," is indicative of a fraudulent intent,
or at least of a desire to conceal something which could not
bear the light, but yet of which the guilty party might desire

33—61st ILL.

at some time to take advantage; and he further insists that the consideration is so grossly inadequate as to compel a court of equity to set it aside as fraudulent.

It is said that no such money consideration was paid, and there is no proof it was paid. It is proved, however, that the lands, of which an undivided third was conveyed, were subject to a mortgage to Newberry of $30,000, which, with the interest up to the day of the date of the deed, amounted to $36,000.

The conveyance was made to Muhlke, subject to the payment of one-third of all the incumbrances upon the property, and though he did not covenant to pay them, still, no title to the property could be enjoyed by him until he should relieve it from the lien. By accepting the deed, Muhlke impliedly undertook to pay his proportion of the incumbrance on the premises, and though that might not of itself be a sufficient consideration for a conveyance of one-third of the property, which exceeded in value many times the amount of the incumbrance, yet it may relieve it from the charge of being fraudulently made, when it appears it was satisfactory to the grantor at the time, though it may not be satisfactory to the complainant, now.

Cases may be found, perhaps, and one is cited, *Murray* v. *Palmer*, 2 Schoales & Lefroy, 482, where it was held that these words, "thrown into the body of a deed of purchase, are always of themselves symptoms of fraud." They are but symptoms, which may be removed by the real facts of a case.

What are the facts in this case? Muhlke had rendered four years' service, of the most important character, to Uhlich, for which he had received no compensation, and on the day of the date of the deed, and simultaneous with it, he entered into a covenant to continue those services even after the death of Uhlich; and if he himself should die, he covenanted that his successors after him, and at the expense of his estate, should render them.

The proof shows that, immediately after entering into this covenant, Muhlke endeavored to free himself from his mercantile partnership, but without success. By the articles· of co-partnership, it could not terminate under one year, and although it had been determined to carry it on, with Muhlke at the head, beyond that term, yet he caused an end to be put to it, at the expiration of the year, left the concern, opened an office in "Uhlich's block," devoting his entire time to the business of his employer.

It is in proof, when this covenant was entered into by Muhlke, his business as a merchant was large and remunerative, and gave promise of a speedy fortune; in fact, he had, by it, acquired property estimated at $50,000. It is by no means certain that he did not, by thus surrendering such a business, deprive himself of gains which would have amounted to the value of the property conveyed to him at the time it was conveyed. We think there was adequate consideration for this deed, and must hold it valid.

This topic naturally suggests some other considerations. It may be said the true relation subsisting between Uhlich and Muhlke was that of principal and agent, confidential if you please, and nothing more. In relation to such, the rule is well settled, that a gift by one to another, who has been for many years his confidential agent and adviser, is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood to the donor. Kerr on Fraud, 125. It is also there held, that there is no rule to prevent an agent from dealing with his principal in respect to the matter in which he is employed as agent, but he must show, to the satisfaction of the court, that he gave his principal the same advice in the matter as an independent and disinterested adviser would have done. Ib. 125.

If no advice is asked of the agent, and none was necessary in this case, none could be given. The transaction is not to be based on these narrow grounds. The whole field must be surveyed, the most prominent objects regarded, and the true

516          UHLICH v. MUHLKE et al.          [Sept. T.,

Opinion of the Court.

nature and character of the transaction considered, which we
have endeavored to do, and find it unlike, in its most import-
ant features, any one of the numerous cases cited.   We have
examined all the cases accessible to us, which have been cited,
and find no one of them, in its leading features, like this.   It
is not like the case of *Butler et al.* v. *Haskell*, 4 Dessaussure,
651.   The note of that case is: The heirs apparent of an
idiot, whose estate was ·in the hands of a committee, being
weak, illiterate and necessitous, and finding a difficulty in
procuring and perpetuating the evidence of their relationship,
employed an agent to transact the business for them, at a com-
mission of ten per cent on the amount to be recovered; the
agent afterwards purchased their interest in the estate at about
one-fourth its ultimate value; when the estate was recovered,
he took from them, in pursuance of his purchase, a convey-
ance of their interest and a power of attorney to promote the
decree, and to receive to his own use their share of the estate
yet to be accounted for.   The contract of purchase. was set
aside on the ground of gross inadequacy of price, connected
with the weakness and necessities of the sellers ; and on the
further ground, that the agent was legally incapacitated to
purchase from his principal the estate which was the *subject of
the agency*, so long as this relation of confidence existed.

This decision was made in 1817, and the last clause of it is
not the law as now understood, as the authorities abundantly
show.   Thus, Mr. Justice STORY says, in his treatise on Equity
Jurisprudence, "it is therefore for the common security. of all
mankind, that gifts procured by agents, and purchases made
by them from their principals, should be scrutinized with a
close and vigilant suspicion.   Agents are not permitted to be-
come secret vendors or purchasers of property which they are
authorized to buy or sell for their principals; *or,* by abusing
their confidence, to acquire unreasonable gifts or advantages;
or indeed, to deal validly with their principals in any case,
except where there is the most entire good faith, and a full
disclosure of all facts and circumstances, and an absence of

all undue influence, advantage or imposition." 1 vol. sec. 315. It is not like the case of *Huguenin* v. *Baseley,* 14 Vesey, 272, where a widow lady settled upon a clergyman and his family the great bulk of her estate, of the value of which she was ignorant, she living in the West Indies, some thousands of miles from the property. It was a clear case of imposition, undue influence and fraud.

It is not like the case of *Pickett* v. *Loggon,* ib. 215, where a conveyance by lease and release and fine was set aside upon great inadequacy of consideration *combined* with misrepresentation and surprise upon parties in extreme pecuniary distress, ignorant of their interests, and not properly protected. In a note to this case is the following passage from Story's treatise, from which we have quoted, *supra,* sec. 251 : "If proper time is not allowed to a party, and he acts improvidently ; or if he is importunately pressed ; if those in whom he places confidence make use of strong persuasions ; if he is not fully aware of the consequences, but is suddenly drawn to act ; if he is *not permitted* to consult disinterested friends, or counsel, before he is called upon to act in circumstances of sudden emergency, or unexpected right or acquisition."

It is not like the case of *Greenfield's Estate,* 2 Harris, 14 Penn. State R. 489, where a widow lady, of the age of eighty-six, hard of hearing, and otherwise infirm, made a deed of conveyance to four persons, for the consideration of $100, one of whom was her confidant and adviser, in which an estate was conveyed worth $200,000. The deed was absolute on its face, but was accompanied by a written declaration of trust, executed on the same day. Neither of the deeds was read to her or by her, and she was dependent on others, in whom she placed confidence, for advice and direction in her pecuniary affairs. The court say, " looking to the whole case as it is presented by both proofs and pleadings, the questions may be asked, was Mrs. Greenfield aware that, by the terms of the declaration, her estate was to be burdened with the payment of $40,000 as compensation to the trustee? Did she know that

518                 UHLICH *v.* MUHLKE *et al.*           [Sept. T.,

Opinion of the Court.

this sum was payable, though each of the trustees might decline the burden of the trust within a year after its creation? She might have been acquainted with the first provision without being cognizant of the last, for they are widely separated in the deed. Who shall say it was not so? And yet to sustain it, I repeat, it must be clearly established she not only knew of, but comprehended both thoroughly. It is extremely difficult to believe she understood, and deliberately assented to this. The doubt is sufficient to invalidate the provision."

The case of *Griffiths* v. *Robins*, 3 Mad. Ch. R. 105, top paging, is so meagre of facts, unaccompanied by any argument of the court, that it can not be regarded as authority on this point. The court say, "I do not think it necessary to enter into all the transactions stated to be attendant on the deed, and in the manner which it was prepared. It is sufficient to say, that the defendants have not made out that case which the policy of this court requires from persons standing in that relation to the donor in which they have placed themselves." The decree was according to the prayer of the bill, that the deeds of *gift* be given up.

It is not like the case of *Whelan* v. *Whelan*, 3 Cowen. 537, decided in the court of errors. That was a clear case of fraud and imposition practiced by a son, who had full control over his father, by which he obtained from his father a deed for his farm, valued at $9000.

It is not like the case of *Hatch* v. *Hatch*, 9 Vesey, 292, where a conveyance from a ward to her guardian, under circumstances showing fraud and imposition, was set aside.

The case of *McArtee* v. *Engart*, 13 Ill. 242, decides only, that mere inadequacy of consideration in the conveyance of land, as between vendor and vendee, would not justify the interposition of a court of equity to set aside the conveyance, unless it was so gross and palpable as to shock the moral sense; but, when fraudulent practices are used, under such peculiar circumstances as make the vendor the prey of the vendee,

the aid of the court may be had. The facts of the case show fraudulent practices of an aggravated character.

The case of *Casey* v. *Casey,* 14 ib. 112, but recognizes the well established rule which we have quoted: when confidence is reasonably reposed, it must not be abused. The party relied on must see that he meets fully and fairly the responsibility of his position, and takes no advantage, either to the injury of another or for his own gain.

The case of *Jennings* v. *McConnel,* 17 ib. 150, was a case between client and counsel, and the uniform rule recognized, that, in such cases, it is not incumbent on the client to prove fraud; upon showing the relation, the onus is upon the attorney to show fairness, adequacy and equity, and upon failure to make proof, courts of equity treat the case as one of constructive fraud.

The case of *Dennis* v. *McCagg,* 32 ib. 429, is to the same effect.

The case of *Baldwin* v. *Dunton,* 40 ib. 188, is upon the question of mental capacity to make a contract for the sale and conveyance of land, and has no bearing upon the point now under discussion.

The case of *Gibson* v. *Russell,* 2 Young and Collier, 21 Eng. Ch. Rep. 104, has a direct bearing on one point of this part of the case, and that is, in relation to the expressed money consideration. In that case, there was a simulated payment of £1000, effected in this way: The grantee, an old and infirm man, and not in full possession of his faculties, but worth £30,000, made a conveyance to his medical attendant of the most valuable part of his estate, on the payment by the latter of that amount of money, which the grantor had privately handed to him for that express purpose. The deed, it was held, stated, contrary to the truth, a money consideration, and that was held one of the proofs of fraud in obtaining the conveyance.

If the consideration of the deed now in question rested alone upon the money expressed in it, and there was in fact no

520          UHLICH *v.* MUHLKE *et al.*          [Sept. T.,

Opinion of the Court.

money paid, it would be, palpably, a circumstance from which fraud might be inferred, if there was proof the grantor was imbecile, or incapable of knowing what he was doing. But we have already said all we deem necessary to be said on this point of the case. We are satisfied the deed of March 20, 1865, is liable to none of the objections made to it, and is, in all respects, a valid instrument.

We will now consider the deeds executed in September, 1867.

It is objected to those, also, that they were obtained by fraud and undue influence, while the grantor was of weak and unsound mind, and were the result of fraud and conspiracy on the part of Muhlke and Ernst, by undue influence, not only to obtain a large share of the property of Carl Uhlich, to the exclusion of complainant and August, but also fraudulently to obtain from complainant conveyances confirmatory of such fraud, and further assurance of the title to the lands thus fraudulently obtained by them, and to deprive complainant of the property he was told was given to him, and to obtain, in addition, covenants of warranty from him of their title. And further, that the deed of complainant was obtained from him through fraud, and was without consideration, and executed and delivered under a mistake of law and of fact, and under threats and compulsion.

In regard to these deeds, we can not concur with the views expressed by the learned judge who tried this cause. Nor do we concur in the opinion, that the will of 1861 was valid for any purpose connected with this cause. It had not been probated, and no rights were claimed under it, by any of the parties to this suit, and was superseded by the will executed July 10, 1867, which, in its turn, was superseded by the deeds of September of that year. The will of 1867 was not probated, nor were any rights claimed under it, nor was it before the court for adjudication.

The charges in the bill of complaint against these deeds are of a loose and general nature, and no proof is offered to

sustain them, it being taken for granted the court will presume them to be true from the relation which Muhlke bore to the grantor, Carl Uhlich, and that he, by reason of his control over Ernst, could make him his tool in a conspiracy to defraud complainant of his rights.

The idea that the old man was incapable, by reason of mental infirmity, to make the deeds, has nothing to rest upon. He was quite as competent in 1867 as he was in 1865, when he made the deed of March 20 of that year. Nothing had occurred since then to weaken his mental powers. His physical powers were impaired somewhat, as he had become nearly blind, but in other respects he had no infirmity not common to persons of his age. *Lindsey* v. *Lindsey*, 50 Ill. 79. He had competent understanding and a disposing mind, and remembered well all he had done, and told his friend, Hammermiller, what property he had conveyed to this and to that son, and to Muhlke.

But it is said, these deeds were the consequence of the will, and as that was effected by the influence of his wife, when on her death bed, a fortnight previous, it was not his will, and the deeds, therefore, can not be considered as his voluntary act.

There is not a particle of evidence in the record of any interference by Mrs. Uhlich with her husband as to the terms of a will. She was desirous the will which bequeathed to her the bulk of the estate should be changed, as her death was approaching, but how changed, who were to be the beneficiaries, no witness has stated. All we know about it, is the statement of Elizabeth Uhlich, in which she says: "On the evening of the day Mrs. Uhlich died, Mr. Uhlich called us up to the bedside of the old lady, who was in the front room, and he told us he would institute Mr. Muhlke as a child in the will, because he had well attended to his affairs and to his business, and that if it had not been for Mr. Muhlke, we would all have to carry saw-bucks, and that if Henry got a start, or a beginning, he would run the whole of it through. I don't know

522          UHLICH v. MUHLKE *et al.*          [Sept. T.,

Opinion of the Court.

whether he meant he would spend it, or that, if he got hold, in any way, he would spend it in law. And he further told us we should not hate Mr. Muhlke, but live together in a brotherly spirit; that this man had deserved it."

The record will be searched in vain for evidence of influence, undue or otherwise, exerted by Mrs. Uhlich, or by any other person, over the testamentary disposition of his estate. There is no evidence of it anywhere,.other than the fact that Muhlke was a great favorite of Mrs. Uhlich, and it might be inferred, when she was informed he was to be a child in the will, and she expressed no dissatisfaction therewith, that it was at her own instigation. But this would be a very forced inference, which no court would be justified in drawing, for the purpose of invalidating a will in other respects valid.

We see no evidence that this will was the conception of Mrs. Uhlich, or that she had the least agency whatever in causing it to be executed, save and except a wish she often expressed, in expectation of her death, that her husband should make another will in her lifetime, which he declined to do.

Mr. Uhlich, judging from the testimony, was not a man of malleable mind, to be beaten out or shaped by any designing person. He had his own mind, and his own notions of right and justice, and acted upon them on all occasions. The fact there were unkind feelings between him and his wife about the will, amounts to nothing, as they disappeared in a moment. He was kind to her, and confided in her to her dying day.

For aught that appears in this cause, this will, if offered for probate, should have been admitted as the last will and testament of a man of sound and disposing mind and memory, uninfluenced by any one.

But there is no necessity for giving to it much consideration, as another and different disposition of the property specified in it was subsequently made by the testator in his lifetime, which was, the several deeds executed in September following.

We have purposely laid out of view the conduct of complainant towards his parents, or the expression of any opinion

upon his claims to paternal confidence and regard, believing it is wholly immaterial, in treating of these deeds, to designate the status he ought to occupy.

We take the ground, that all the property conveyed by these deeds, being the property of Carl Uhlich, he had an unquestioned right to convey it to whom he pleased, there being no creditors; that complainant had no claim to it, nor any other of his sons; that the grantor had a perfect right to impose conditions upon any one of the grantees, to make the deed to him operative; that he had a right to judge who were proper objects of his bounty, and, if free from insane delusion or senile dementia, passing by his own children, give it to aliens to his blood. This principle was distinctly announced by this court in the case of *Heuser et al.* v. *Harris,* 42 Ill. 425, and *Clearwater* v. *Kimler,* 43 ib. 272, and is the doctrine of the American courts. In the first case, it was said, a child has no natural right to the estate of his father; if he has, it is a right which can not be asserted against the testamentary disposition of the estate by the father. A disposition of an estate by the owner, by will or deed, there being no legal impediment, determines its destiny.

The whole principle was embraced in the language of the old man, when, on the 21st of September, 1867, the parties had met at his house to receive and give deeds. When everything was explained to the complainant, he saying that he understood it himself; that he was not a boy, but hesitated to sign the deed required of him, " Won't you take that, if I give you so much? Then I'll give you nothing; then you shan't have anything; I can do what I please with my property."

This property belonged to Carl Uhlich. He disposed of a portion of it to complainant, in value not far from $70,000, on condition complainant should release to others of his grantees of other portions of the property, all his right, title and interest to such other portions, with special covenants against himself. He accepted the deed with that condition. He executed the clause after full consideration of three days, knowing

its contents and effect. He, in his father's lifetime, took possession of his portion, sold some of it, mortgaged some, and exercised complete dominion over it, and now asks that all the proceedings shall be set aside, for reasons having no foundation in fact, and unsupported by any principles of equity or justice.

This arrangement by deeds, rather than by will, may be regarded in the light of a family arrangement, which is favored by courts: Kerr on Fraud, 364.

There is nothing to show the father was not a free agent in thus distributing his property, or incompetent in any degree. His desire was to satisfy all his children, including complainant, for whom it would appear he had but little affection. It was made by Carl for the purpose of avoiding litigation after his death. He had the right to dictate the terms on which he would make the distribution. Complainant accepted those terms, and must be concluded by his own voluntary act. His father had the right to omit him entirely, but out of regard to the memory of his deceased mother, he gave him an ample fortune, of which he at once took the control.

The fact that complainant's deed of release to Ernst and Muhlke conveyed away the best portion of the estate granted to him, can not operate to upset all these proceedings. It was a mistake, clearly, which the parties, on being informed of, proffered to rectify at once, and executed proper deeds of conveyance for such purpose, so that complainant might be assured in the title to all his father had granted to him.

There is nothing in this case to commend it to the favorable consideration of a court of equity. There is much to show complainant should be grateful for that which has been given him.

On the whole case, we are of opinion that so much of the decree as establishes the deed of Carl Uhlich and wife to John H. Muhlke, of the date of March 20, 1865, to be a valid deed, be and the same is affirmed; and so much thereof as establishes the will of Carl Uhlich, of July 6, 1861, a valid will,

and the deeds of September 19 and September 27, 1867, particularly described in complainant's bill, as invalid, be reversed, and the said deeds be and the same are hereby declared to be good and valid in law. The costs to be paid by the complainant, Henry Uhlich.

*Decree modified.*

Per Curiam: A rehearing having been granted in this cause, the same was heard at the September term, 1871, of this court. After the rehearing was granted, it was suggested to the court that Henry Uhlich, the complainant, had died, leaving a last will and testament, by which he appointed his wife, Louisa Augusta Uhlich, his sole executrix, and constituted her his sole devisee, since which the cause has proceeded in her name.

Elaborate arguments were presented at the second hearing, which we have carefully considered, and have again reviewed the whole ground on which the opinion filed was based, and find nothing therein we desire to correct, believing the law is therein correctly stated and applied to the facts proved. A majority of the court abide by the opinion as filed, and it must stand as the judgment of the court.

In that opinion is found this clause: "The fact that complainant's deed of release to Ernst and Muhlke conveyed away the best portion of the estate granted to him, can not operate to upset all these proceedings. It was a mistake clearly, which the parties, on being informed of, proffered to rectify at once, and executed proper deeds of conveyance for such purpose, so that complainant might be assured in the title to all his father had granted to him."

In order to ascertain if such deeds of conveyance have been made, acknowledged and delivered, or tendered, by Ernst Uhlich and Muhlke, in the lifetime of Henry Uhlich, the cause is remanded to the Superior Court of Cook county; and should it there be made to appear such deeds have not been executed and acknowledged, the Superior Court will order and

direct the same to be executed and acknowledged in a reasonable time, to be fixed by that court, and delivered to the present complainant, or deposited with the clerk of the said court for her use, after the same shall be approved, as to form and substance, by said Superior Court.

Mr. JUSTICE THORNTON, dissenting:

I can not agree to the opinion of a majority of the court in this case, and the importance of the principles and the large interests involved, require more than a bare dissent.

The opinion holds, that the mind of Carl G. Uhlich was sufficiently active and vigorous to enable him to comprehend fully the intent and effect of the several deeds executed by him.

After a careful reading of the testimony, I am compelled to a different conclusion. The evidence is voluminous, and a glance can only be taken of it.

When Muhlke undertook the management of affairs, Uhlich was eighty years old. He was a native of Saxony, and could neither read, write, nor speak the English language.

Though there is some discrepancy in the evidence, as to his mental condition, from the assumption of the agency, in 1861, until his death, in 1867, yet the great preponderance, and the most reliable, indicates an enfeebled condition, both of mind and body. The witnesses for complainant refer to acts and language irreconcilable with a sound and healthy intellect, while the witnesses for defendants generally express mere opinions.

A number of persons who had known Uhlich for from seven to twenty years, testified that he was childish, his memory almost a blank, and that often he did not recognize persons whom he had known intimately for years. On the day succeeding the death of his wife, he had forgotten all about the sad event, which naturally would be indelibly impressed upon

his memory.   For some time before his death he had to be nursed and dressed, as a child.   He yielded readily to flattery, and had strong dislikes and prejudices.   In the vigor of his manhood, he was intelligent, and was active and prompt, before care and age and sickness had weighed heavily upon him. But for years before his death his conversation was deficient in coherence.   At times he was singularly strange and erratic. Though rich, he seriously apprehended that he would be reduced to poverty, and would gather up and eat scraps of meat and bread which had been thrown away as offal.   He would frequently converse upon the subject of religion, the end of the world, and the day of judgment, and would become so excited as to imagine that he saw "the Kingdom of Heaven" and his deceased daughter, in full view.   He conceived the idea that, at his death, he would be transferred to the moon. An old acquaintance, who had known him in Saxony since 1828, visited him in 1864, and spoke to him about the politics of the day.   The reply shows a crazed condition of mind.   It was:  " This amounts to nothing.   I am what Mr. Muhlke is.   Here they come together, the Turk and the Anti-Christ, and when they get through, the Turk and the Anti-Christ will come and cut everything to pieces, and Chicago will sink down."

This witness said Uhlich did not speak figuratively, but seemed to be in a state of enthusiasm, and that the conversation was discontinued, and he was satisfied that no man of sense would talk in such manner.

In the language of some of the witnesses, Uhlich himself said frequently "he forgot everything."   "He was no longer capable of doing anything any more."   "Sometimes he did not know what he was doing."   " Had to give up his business to Muhlke, because he was so old, feeble and forgetful." " Could not take care of his business, complained of his mind and memory, and wished he was dead."   " He had to sign whatever he was told ; did not know what he was signing, and had to believe whatever Muhlke did."

Language could not depict a more absolute state of dependence and despondency.

In 1867, Muhlke himself said to different persons: "The old man is not exactly right in his head all the time." "He is in bed on account of old age." "He did not know what he was doing." He also admits, in his answer, that Uhlich was unable, alone, to manage his affairs when he undertook the agency.

According to the testimony of his family physician, the old man had been afflicted with chronic bronchitis for several years before his death. As age approached he had grown feebler in body and mind. In 1865, when the first deed was executed, he was eighty-four years of age. In 1867, when the grand result was brought about, in addition to more infirm health, a shattered constitution, a vigorous intellect blighted, the death of his wife, estrangement from the only son capable of advising him, and increased old age, he was also blind.

Was it right to make a bargain and effect a family settlement with regard to an estate worth $1,000,000, with this semblance of a man, an almost empty casket whence the soul was about to depart?

But I do not rely upon the condition of mind, and physical infirmity, alone, to impeach the deeds. There was a relation between the parties more controlling in its influence, and potent in its effects, than that of ordinary principal and agent, and the several deeds must have been the result of this relation and the influence thereby exerted.

Muhlke, with the money of his principal, built a house on a lot adjoining his own residence. From this time forward a constant supervision was exercised over the old man. Elizabeth Uhlich says "Muhlke was in every day at Uhlich's." Muhlke was not only agent, but confidential adviser; was consulted about a family settlement and a proper distribution of the estate amongst the children. He and his family were constant visitants. The relation was of the most intimate character. Uhlich and wife were so dependent upon him for

money and assistance and counsel, that they were induced to believe that he had rescued their fortune from almost total wreck, when it is evident that it was the unparalleled appreciation of property in Chicago which made them one half million of dollars.

They were old, credulous and trustful, susceptible to flattery, and so beguiled that no extravagance of language in praise of Muhlke, seemed to them hyperbole. They called him their "guardian angel," whom Providence had kindly sent to shield them from ruin and poverty. The means adopted had the effect to establish an absolute dependence, and an implicit confidence, almost childlike in its character.

I shall not undertake to fathom the motives of Muhlke. I desire only to trace the cause, and ascertain the effect, so as to apply the true principle of law, as I understand it.

Muhlke seemed chary of asking compensation, or demanding a share of the estate, until his power was firmly fixed. Once he spoke to Vanshoove, and said he had done so much for the old man, and he had never referred to the subject of compensation, and made the inquiry: "How much will he pay me?" This was communicated to the old man. He replied: "Well, I don't know. What does he want?"

Then, in his answer, Muhlke admits that the subject of compensation was spoken of several times during the first four years of the agency, and that Uhlich always postponed the matter with the remark that he desired the relation of father and son to exist between them.

Again, in August, 1864, Uhlich said to one Gross, that Muhlke was the most honest man in Chicago; that he had offered to pay him, and *he refused to accept anything.* The propitious time had not yet arrived.

In November, 1864, the removal is made to the new house. It was handsomely fitted up, had gas and hot and cold water, and was grand in the estimation of these plain people, and so very different from anything to which they had been accustomed.

34—61ST ILL.

Why was this removal made? Uhlich said to Lang: "Muhlke wanted me near him, so that he could counsel with me all the time."

Daily intercourse followed; Muhlke had entire control; he was Uhlich's sole dependence for advice; all suspicion was lulled, and the most unbounded confidence existed.

Thus matters continued until in January, 1865, when, as I gather from Muhlke's answer, Uhlich and wife proposed a conveyance to him of one-third of their property, valued at $125,000. He says he was surprised, though flattered, at the proposal, and the evidence of confidence; that *he was reluctant to accept; was doubtful whether he would gain in money or comfort; was afraid of jealousies and trouble after Uhlich's death, and gave an evasive reply.*

Did the proposition at first shock him? Did "coward conscience" then afflict him? Did honest compunction, and some regard, then, for the higher right of the children, deter him? Or was the object to decoy, and grasp more? The sequel will show.

In March, 1865, the offer was renewed and accepted. Muhlke, in his answer, says the offer was liberal, and "all that, in reason, could be expected."

He had hoped, then, for a larger gift. What had settled his doubts and removed his fears of jealousy and trouble? His efforts to obtain more had failed, then all doubt and fear vanished, and he gracefully accepted the magnificent donation.

The offer was indeed liberal—one-eighth of a million of dollars for less than four years services. They were not of any extraordinary character, requiring unusual or arduous labor, or any outlay of capital, but would have been amply compensated with $3000 or $4000 per annum.

From this time until September, 1867, when Muhlke obtained about one-half of the estate, for no consideration except his services for about five years the intimacy continued unabated, and the confidence undiminished.

I will mention a few more incidents which occurred before the denouement of the drama.

Uhlich was an enthusiast upon the subject of religion. Muhlke prayed with him and read the Bible to him daily.

The "golden wedding" followed. There were, prominent, Muhlke, and also Pastor Hartman, the religious adviser of Uhlich,—the one soon to obtain an immense fortune, the other laboring for a donation from the rich man to an orphan asylum.

On that occasion, Muhlke presented a handsome bible, worth twenty-five dollars, and had just before purchased a carriage, with Uhlich's money, costing thirteen hundred dollars, for the accommodation of the old man, who thought he would be beggared by the payment of the small pittance necessary to ride upon the street cars.

The pastor performed anew the marriage ceremony, and announced that Uhlich would make a donation to the orphan asylum.

This wedding must have been a sad and sickening scene to the old couple. They were infirm, tottering on the brink of the grave, in the midst of a scene to them so strange, and such a contrast to anything to which they had been used; and they must have felt as intruders, amid the gaieties and festivities, the drinking and feasting, the toasts and speeches.

In June following the wedding in January, Mrs. Uhlich died; in July, Uhlich made his will, substantially like the subsequent disposition of his estate, and was carried to Muhlke's house for the purpose; and in September the several deeds were executed, by virtue of which the complainant received only about sixty thousand dollars of this immense estate, and his children were wholly disregarded, and the agent acquired an immense fortune.

At this time, Uhlich was almost helpless. Twice he had to be asked before he made any attempt to make his mark to his signature, and was assisted for fear he would fall.

There is something suspicious about the deeds themselves. Those from Uhlich to his sons, Ernst and August, were in consideration of "love and affection," and designated them as "sons of Carl G. Uhlich," while the deed to Henry did not recognize him as a son, but was made as to a stranger.

This old man, imbued, we may hope, with the spirit of Christian charity, with some lingering affection for his son Henry; deprived of the light of heaven, and no longer cheered by smiles nor intimidated by frowns, and soon to face a future fearful to one with anger and passion in his heart, could not have made this distinction between those of his own blood, if undue influence had not been exercised over him.

Another singular fact should be mentioned in this connection. For years prior to the commencement of the agency, Henry had assisted his father, and been loved and trusted by him. The estrangement commenced about the beginning of the agency, and increased with the increase of confidence in the agent.

But even concede that Henry was ingrate and undutiful, this could not have destroyed all love and affection for his children. They, at least, were innocent. They loved their grandfather; and he always, to his death, manifested for and towards them the utmost fondness and attachment.

Why were they disinherited? Why were they not sharers in this great wealth? Muhlke can, perhaps, explain the strange and unnatural act which resulted in their deprivation. I shall not attempt an answer.

I must now, as briefly as I can, notice the law as laid down in the opinion of the court. It is conceded that, at the time of the execution of the deeds, the grantee sustained to the grantor the relation of confidential agent and adviser. The court then proceeds to combat an ideal position—that the deeds are *ipso facto* void—a position never assumed by the counsel for the complainant, as I understand their argument. A very proper stricture is then made upon any attempt to deprive a man of the right to bestow a gift in remuneration of

important services; for it is said that "kindness and friendship to the distressed would then be under a legal ban."

There is, and should be, no rule of law to check the growth of the kindlier feelings of our nature; to prevent the bestowal of gifts as a reward of merit or a manifestation of friendship; or to trammel the free and voluntary disposition of property.

The suspicion of the law, however, is always excited when a gift, greatly disproportionate to services rendered, is made to a fiduciary. Courts then assume jurisdiction to examine the case and give relief, "not for the purpose of infringing the right of alienation, but to secure the full and uninfluenced enjoyment of it."

The court then announces the rule of law to be, that the party assailing a deed executed when the fiduciary relation exists, must prove that the fiduciary abused the confidence reposed in him, and took advantage of the relation, and until this is done, the fiduciary is relieved of any explanation.

The following is the language used: "It is difficult, at all times, to prove a negative—to prove that a grantee, standing in this (fiduciary) relation, did not use the influence he possesed over the grantor to induce the deed—that he did not abuse the confidence reposed in him. Nor does the rule of law require it."

Again, it is said: "A gift by one to another, who has been for many years his confidential agent and adviser, is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood."

. I can not yield my assent to this as the rule of law, so inconsistent as I regard it with justice and general public policy. When the relation of agency and active confidence was so fully proved, the presumptions of law were against the fairness of the transaction, and the burden of proof was on the agent to explain and rebut the presumptions. It then became a case of constructive fraud.

Constructive frauds include acts which, though not originating in any actual evil intent, tend to impose upon, deceive and mislead. They will arise out of a fiduciary relation, which is watched with peculiar jealousy, for it affords the power and the means of exercising undue influence. The object of the law is to preserve from temptation, and to deprive acts performed while the relation exists of all legal protection, unless they are fair and pure and above the reach of suspicion. The principle stands independent of any *indicia* of positive fraud, and relief will often be given in such cases, in which, but for the relation, there would be no interference.

"The burden of proof lies, *in all cases*, upon the party who fills the position of active confidence, to show that the transaction has been fair." Kerr on Fraud, Ed. 1872, 151.

The same writer says, on page 386: "Upon the same principle, if it appear that a fiduciary or confidential relation exist between the parties to a transaction, or if it be established by evidence that one of the parties possessed a power of influence over the other, the burthen of proof lies upon the party filling the relation of active confidence or possessing the power of influence, as the case may be, to establish, beyond all reasonable doubt, the perfect fairness and honesty of the transaction."

The law further requires that the fiduciary must show that the parties were substantially at arm's length and upon an equal footing; that the donor had competent and independent advice; that his conduct was not the result of the influences caused by the relation, and that he acted voluntarily, deliberately and advisedly.

Has the agent complied with the requirements of the law? I think not. There was no independent and disinterested adviser. The counsel who prepared the several deeds and assisted in their execution, were the counsel of the donee and not of the donor. The wife was no competent adviser, in the eye of the law. She was under the same influence as the husband. Neither was the feeble and aged man upon an

equal footing with the skilled agent, who was, in the language of Farwell, " a good business man and had succeeded in everything which he had undertaken," and who had a temptation before him which only true virtue could resist.

I have quoted from the same author referred to in the opinion, and it seems to me that the principle contained in the quotations is a plain one, simply expressed and directly applicable to the facts of this case.

I shall proceed to refer to some of the same adjudged cases, which, it is said, are unlike this case in its important features. While the facts may be unlike, the broad, comprehensive principle in all the cases is identical with the citations from Kerr.

In *Gibson* v. *Jeyes*, 6 Ves. Jr. 266, the relation of attorney and client existed. Lord ELDON said the parties might contract, but that it resulted from the rule of the court that the whole *onus* of the case was thrown upon the attorney. He then said: " It is asked, where is that rule to be found? I answer, in that great rule of the court, that he who bargains in matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence—a rule applying to trustees, attorneys *or any-one else.*"

In *Billage* v. *Lauthee*, 9 Hare, 534, the Vice Chancellor said: " Where a gift is set up between parties standing in a confidential relation, the *onus* of establishing it by proof rests upon the party who has received the gift." In another part of the same opinion it is said: " No part of the jurisdiction of a court is more useful than that which it exercises in watching and controlling transactions between persons standing in a relation of confidence to each other. The jurisdiction is founded on the principle of correcting abuses of confidence, and ought to be applied, *whatever may be the nature of the confidence reposed or the relation of the parties* between whom it has subsisted."

In *Harrison* v. *Guest*, 6 Gex, Mac. & Gordon, 424, the same general principle is asserted that, whenever the fiduciary relation subsists between vendor and purchaser, the burden of proof is on the party who sets up the transaction against the person whom he should protect.

In *Cooke* v. *Lamotte*, 15 Beavan, 239, Sir J. ROMILLY, in speaking of the confidential relation, said: "The rule is, where these relations exist, by means of which a person is able to exercise a dominion over another, the court *will annul the transaction, unless the person taking the benefit can show that the transaction was a righteous one.*"

Apply this rule to Muhlke, and it is a just one; and I am afraid that he would never succeed in proving the *righteousness* of the transactions with Uhlich.

In *Griffiths* v. *Robins*, 3 Madd. 191, there was no technical fiduciary relation, yet a deed of gift was set aside, because the donor, an old person, placed confidence in the donee, and the latter did not show that the deed was the result of free will.

In *McCormick* v. *Malin*, 5 Blackf. 509, there was no formal relation of principal and agent, but confidence was reposed, and the court say: "In the technical relations, such as *principal and agent*, client and attorney, etc., equity implies a confidence; and in all contracts between them, to which the confidence extends, requires of the party in whom the trust is reposed the highest degree of good faith. *On him rests the duty of proving that the contract is in every respect fair and equitable.* If he fails in this, it is a constructive fraud," and the contract must be held invalid.

In a recent case in Missouri (*Cadwallader* v. *West*), the principles of law governing cases of this character was fully and elaborately discussed. The suit was brought by the heirs of Cadwallader, deceased, to set aside a deed alleged to have been obtained by undue influence. The relation of medical adviser and patient existed. Cadwallader was an old bachelor, and Dr. West had resided in the same house with him

for thirteen years.   There was no proof of any active influence, and the consideration consisted of ordinary medical services, supervision of the property and kind care of the deceased.   The value of the property was about fifteen thousand dollars, and the proof showed kindness and attention on the part of the donee.   The court held that the law presumed the deed to be the result of undue influence, emanating from the younger and stronger party; that it was *prima facie* void, and could not be sustained as a gift, on account of the relation of confidence.

This court, in its opinion, refer to the case of *Butler* v. *Haskell*, 4 Dessaussure, 651, and deny the principle asserted in it that an agent is legally incapacitated to purchase the estate which is the subject of the agency.

Yet this court said in *Dennis* v. *McCagg*, 32 Ill. 429, that an agent "was disabled from dealing in the matter of his agency."

In *Butler* v. *Haskell* the relation was principal and agent, and the rule declared was, that where a great advantage is gained by the agent from the principal, the agent must prove the transaction perfectly fair and pure.

In *Ladd* v. *Grove*, 33 Maryland, 188, it was held that a gift obtained by a person sustaining a confidential relation to the donor, is *prima facie* void, and that the burden of proof is upon the donee to establish affirmatively that the act was the free and unbiased will of the donor.

*Greenfield's Estate*, 14 Penn. Stat. 489, is a very interesting case, in its facts as well as in the clearness of the law announced.   The court declared that when the confidence was established, and the benefit to the beneficiary, then arose a case of constructive fraud; and this peculiarity, withdrawing it from the operation of ordinary rules, throws upon the beneficiaries the duty of showing expressly that the arrangement was fair and conscientious, and beyond the reach even of suspicion.

I think the principles which underlie this case, as developed by the facts, have been fully heretofore settled by this court. I shall only refer to one case and the cases therein cited— *Dennis* v. *McCagg, supra.* In that case the relation of principal and agent existed, and the rule is declared as well established, "that trustees and others, sustaining a fiduciary and confidential relation, can not deal on their own account with the thing or the persons falling within that trust or relationship. The temptation of self-interest is too powerful and insinuating to be trusted; and it must be removed by taking away the right to hold the property purchased."

How applicable is the language to the facts of this case! Rarely, if ever, has anyone possessed the confidence which Muhlke had. Rarely, if ever, has anyone been allured by so great temptation. Apply the rule, and remove the temptation for the benefit of him and others in the future.

In its opinion, the court seem inclined to draw a distinction between the relation of principal and agent on the one hand, and attorney and client, and trustee and *cestui que trust* on the other. While some distinction is preserved in some of the adjudged cases—regarding these relations abstractly—there is no reason for the distinction in this case. Muhlke was not only sole agent, but was relied on as an intimate friend; was *quasi* spiritual adviser; a confidant of family secrets, and was regarded with adoration as "guardian angel."

In such a case, if ever, the rule of law to which I have adverted should be applied in all its stringency. A court of equity, under the circumstances, should act without any regard to positive fraud, upon a principle independent of any proof of deceit or imposition—a principle arising out of motives of general public policy, and for the protection of weakness and imbecility, resulting from the infirmities of age and the trustfulness of a second childhood.

After the most thorough examination, I have not found a single case—save the opinion in this case—in which, where

such unbounded confidence existed, a similar rule has been recognized.

In cases of trifling benefits or gifts bestowed somewhat commensurate with the services rendered or the friendship given, there would not be the same ground for interference, upon proof of the mere fact of the confidential relation. The strong presumption of unfairness or undue influence might not then arise. But when so large an estate is almost given away, and the ties of nature are severed, suspicion of wrong can no longer sleep; and when the donor is an infirm and blind old man, confiding as a child, the suspicion is strengthened into absolute conviction.

Another fact should be considered: the inadequacy of the consideration. The deeds to the agent import a consideration, when in fact there was none except the services rendered. The answer sets up the conveyance as a gift. This creates a suspicion, but I shall not pursue the question thus presented. The services constituted a grossly inadequate consideration, such as shocks the mind and furnishes a strong presumption that undue advantage had been taken, when we consider the weakness and age of the grantor. This presumption the purchaser should remove by proof. *Butler* v. *Haskell, supra; Cadwallader* v. *West, supra.*

I think the inadequacy was so gross as, in the language of Lord ELDON, in *Coles* v. *Trecothick,* 9 Ves. Jr. 234, to "shock the conscience" and is evidence of fraud. *Morse* v. *Royal,* 12 Ves. 355.

There is one other fact connected with this transaction to which reference ought not to be omitted, and which adds to the bad faith of the arrangement of September, 1867.

At the date of the deed, in 1865, Muhlke and Uhlich entered into a solemn, written agreement, and in consideration of the deed then made, and as full compensation for all past and future services during the life of Uhlich, and for acting as executor in the management of the property after his death, the agent covenanted to accept the deed. In a little over two

540 UHLICH v. MUHLKE et al. [Sept. T.,

Dissenting opinion by Mr. JUSTICE THORNTON.

years he violated this solemn covenant, and quadrupled his compensation. If the first transaction was fair, justice would say that the agent was estopped; but he could not withstand the temptation, and grasped the greater gain, which his relation enabled him to achieve.

I think that the agent has wholly failed to remove the presumptions of the law, and show the transactions fair, pure, conscientious, equitable and to be the result of the free and unbiased will of the donor.

I am, therefore, of opinion that the whole arrangement is invalid.

Is the complainant estopped from invoking the aid of equity? He should not be debarred the relief prayed for, on account of the acceptance of the deed from his father and the execution of the deed to his brother and Muhlke.

The transaction of September, 1867, was an entirety. Fraud taints the whole of it. In ordinary cases, equity will undo the whole transaction, and place the parties in their former situation. *Danberry* v. *Cockburn*, 1 Meriv. 640.

When the deeds to the agent are void, the other instruments forming a part of the scheme are likewise impeached. They emanated from the same brain; were nurtured and produced under the same influences; were for the same illegal purpose—to grasp possession of the estate.

It can not be said that Henry knew the intent, object and effect of the deeds. He requested permission to take them, examine them and consult a lawyer. This reasonable request was refused; and Smith, the attorney of the agent, said to him: " You had better sign; if you do not sign to-day, you shall have nothing." It is true, the deeds were read to him, and he delayed three days before signing; but the mere reading, under the circumstances, was not sufficient. He was an unprofessional man, and the proof should be satisfactory that the nature, effect and contents of the deeds were explained to and perfectly understood by him. Kerr on Fraud, 387.

Besides, Henry was in the presence of a father, prejudiced against him—it may be justly—and of others who desired and were laboring for his disinherison. He was not informed of the arrangement. The plan was concealed from him. Here was a family settlement, as it is termed, and he, as one of the family, had not the information upon which to act advisedly and deliberately.

An estoppel is not favored in law, and might properly be sustained to prevent the perpetration of a fraud, but not to encourage a fraud.

There should be no confirmation of a transaction so inconsistent with justice, so unnatural and so presumptive of fraud. If so, it would be a ratification of an act which should never have been performed.

I think the decree should be reversed, and the relief asked granted.

Mr. CHIEF JUSTICE LAWRENCE: I fully concur in the dissenting opinion of Mr. Justice THORNTON. In my judgment, the facts disclosed in this record show a gross breach of the obligations imposed by a fiduciary relation.

Mr. JUSTICE McALLISTER, having been of counsel in the cause originally, took no part in the decision upon the rehearing.